FILED

2017 Nov-30  PM 02:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAUN J. YOUNGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-00952-SGC |
| | ) | |
| EXPERIAN INFORMATION SOLUTIONS, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER[1]

This matter is before the court on the motion to reconsider filed by Defendant Experian Information Solutions, Inc. ("Experian"). (Doc. 65). Experian urges the court to reconsider its order on the parties' cross-motions for summary judgment. (Doc. 58). The motion has been fully briefed and is ripe for review. (Docs. 67, 70). For the reasons discussed below, the motion is due to be denied.

## I.     PROCEDURAL HISTORY

The court's order addressed three motions for summary judgment: Plaintiff's (Doc. 36), Equifax's (Doc. 38), and Experian's (Doc. 39). The court granted Plaintiff's motion in part and denied Equifax and Experian's motions. (*See* Doc. 58).

In moving for summary judgment, Experian asserted its duty to reinvestigate under 15 U.S.C. § 1681i(a)(1)(A) was never triggered in this case. (Doc. 39 at 19-21). Specifically, it contended Plaintiff's letter was not a "direct dispute" of an item of information in his file because it was mailed from his attorney's office. In denying summary judgment, the court

---

[1] The parties have previously consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 16).

discussed the evidence of the letter's contents, as well as the circumstances of its composition, mailing, receipt, and review. (Doc. 58 at 14-15). Looking to the text of the statute, guidance from the Federal Trade Commission ("FTC"), and case law interpreting § 1681i(a)(1)(A), the court found there is no genuine dispute that Plaintiff's letter did trigger the duty to reinvestigate. (*Id.* at 15-17).

Experian also argued Plaintiff could not show it acted willfully. (Doc. 39 at 24-27). The court considered *Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007), and subsequent Eleventh Circuit cases holding that a plaintiff must prove the conduct of the credit reporting agency ("CRA") was based on an objectively unreasonable interpretation of the law to support a willful violation of the FCRA. (*Id.* at 18-21). The court noted the Eleventh Circuit's holding in *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330 (11th Cir. 2015), under which a company's action is a willful violation if it "shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." (*Id.* at 19-20); *see also Collins*, 775 F.3d at 1332. Here, the court found that to the extent Experian followed any policy or procedure, there is a genuine dispute as to whether that policy or procedure is "objectively unreasonable" and, therefore, willful. (*Id.* at 20) (*quoting Safeco*, 551 U.S. at 78). However, the court also found that a factfinder might conclude Experian's breach of its statutory duty was only negligent, in that it was "merely careless" even though flawed. (*Id.*).

Experian filed its motion to reconsider on October 12, 2017. (Doc. 65). Plaintiff responded (Doc. 67), and Experian replied (Doc. 69). The court has since ordered the parties to mediation. (Doc. 72).

## II.    STANDARD OF REVIEW

A district court "ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016). Because the order in question denied summary judgment, it is an order entered prior to final judgment:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b); *see also Herman v. Hartford Life and Acc. Ins. Co.*, 508 Fed. App'x 923, 927 n.1 (11th Cir. 2013) ("A denial of summary judgment is technically an interlocutory, rather than a final order, because it does not constitute a controversy's final resolution.").

In addressing a motion to reconsider, the court's need for discretion to revisit its own rulings is balanced against the burden placed on all parties by revisiting settled issues. Therefore, courts in the Eleventh Circuit "recognize three grounds for reconsideration of prior orders under Rule 54(b): (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *King v. CVS Caremark Corp.*, 2015 WL 12778436, at *4 (N.D. Ala. Feb. 8, 2015); *accord Iqbal v. Dep't of Justice*, 2014 WL 169867, at *9 n.18 (M.D. Fla. Jan. 15, 2014); *Brown v. Winn-Dixie Stores, Inc.*, 2016 WL 3443918, at *2 (S.D. Ga. Jun. 17, 2016).

The Eleventh Circuit has held that "a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. United States Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997). Further, the motion "should raise new issues, not merely address issues litigated previously." *Socialist Workers Party v. Leahy*, 957 F. Supp. 1262, 1263 (S.D. Fla. 1997). "In the interests of finality and conservation of scarce judicial resources, reconsideration

of an order is an extraordinary remedy and is employed sparingly." *Gougier v. Sirius Products, Inc.*, 370 F. Supp. 2d 1185, 1189 (S.D. Ala. 2005).

## III.   DISCUSSION

Experian asserts three grounds for reconsideration.   (Doc. 65).   First, it argues a different result is required by two 2017 district court decisions because they present an intervening change in controlling law.   Second, Experian contends this court's denial of summary judgment on Plaintiff's willfulness claim works a manifest injustice.   In Experian's view, other courts have concluded under similar facts that Experian had no duty to reinvestigate and, thus, a jury could not render a verdict finding it acted willfully in this case.   Third, Experian asserts reconsideration is necessary to correct a clear factual error in the court's conclusion that Experian failed to review the contents of Plaintiff's dispute letter before deeming it suspicious.   According to Experian, it is undisputed that its employees "analyzed" the letter's contents before deeming it suspicious.   The court will address each of these three assertions in turn.

### A.   Intervening Change In Controlling Law

Experian points to two recent district court decisions in support of its assertion that an intervening change in controlling law warrants reconsideration here: *In re Experian Info. Sols., Inc.*, No. CV-15-01212-PHX-GMS, 2017 WL 3559007 (D. Ariz. Aug. 17, 2017), and *Turner v. Experian Info. Sols., Inc.*, 2017 WL 2832738 (N.D. Ohio Jun. 30, 2017).   Each of these is a "bellwether" case selected from multiple, similar lawsuits challenging Experian's "suspicious mail" policy.   Both decisions are pending appeal.   *See Warner v. Experian Info. Sols.*, No. 17-16910 (9th Cir. *filed* Sept. 21, 2017); *Turner v. Experian Info. Sols.*, No. 17-3795 (6th Cir. *filed* Jul. 28, 2017).

As an initial matter, the court notes that a decision of another district court represents—at most—persuasive authority. *Camreta v. Greene*, 563 U.S. 692, 708 n.7 (quoting 18 J. Moore et al., MOORE'S FEDERAL PRACTICE § 134.02[1][d] (3d ed. 2011) and stating, "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Experian offers no authority to support its suggestion that the decisions of other district courts should be considered "controlling law," and the court finds none. Accordingly, the motion is due to be denied to the extent it depends on Experian's assertion of a change in controlling law.

Further, the cases Experian relies upon are not on point. Both *Turner* and *In re Experian* address letters sent by a credit repair organization ("CRO") which intervened on the consumer's behalf. The *Turner* plaintiff hired a CRO, which "flagged nine derogatory accounts on [the plaintiff's] credit report" and then "drafted a letter disputing all nine derogatory accounts and mailed it to Experian." 2017 WL 2832738, at *1. The plaintiff "did not write, review, or sign the letter." *Id.* Thus, *Turner* is clearly distinguishable from the instant case, where Plaintiff participated in the writing of his letter. (Doc. 58 at 16).[2]

In *In re Experian*, the plaintiff hired a CRO and granted it a limited power of attorney to "write and send letters to creditors and credit bureaus on [the plaintiff's] behalf." 2017 WL 3559007 *1. The CRO was empowered to use the plaintiff's electronic signature or have a company representative sign letters on the plaintiff's behalf. *Id.* When the plaintiff sent a

---

[2] As the undersigned did in this case, the *Turner* court noted *Klotz v. TransUnion, LLC*, 2008 WL 2758445 (E.D. Pa. 2008). *Turner*, 2017 WL 2832738 *8; (*see also* Doc. 58 at 15). Both *Turner* and *Klotz* held that a fact-specific analysis is required to determine whether a plaintiff who uses the services of a third party has submitted a direct dispute. *Turner,* at *8. In *Klotz*, the court left open the possibility that a plaintiff might trigger the duty to reinvestigate by relying on a CRO to find problems with a credit report and then reviewing the documents, checking them for accuracy, making any necessary changes, and sending the dispute to the CRA. *Id.* (citing with approval *Klotz*, 2008 WL 2758445, at *5).

dispute letter himself from his home address, Experian deleted an inaccurate item from his credit file, updated several others, and sent him a letter to that effect. *Id.* However, when the CRO later prepared and sent letters disputing items in the plaintiff's credit file, Experian generated a "suspicious mail" response substantially identical to the responses in the instant case. *Id.* at *1-2.

The term "credit repair organization" is a term of art. CROs are specifically defined in the FCRA and play a distinct role in the consumer credit statutory framework. When a consumer notifies the CRA of his dispute, the dispute is "direct;" when a CRO notifies the CRA, the dispute is "indirect." 15 U.S.C. § 1681i(a)(1)(A). Here, no CRO was involved.[3] Therefore, this case does not turn on the same legal issue as *Turner* and *In re Experian*.

In addition to conflating the statute's treatment of a CRO with other third parties, Experian contends Plaintiff's letter did not constitute a "direct dispute" because his attorney sent the letter on his behalf. (Doc. 65 at 12). Experian points to the *In re Experian* court's comment that, "[t]he contrast between 'directly' and 'indirectly' is the contrast between the consumer doing something alone and the consumer doing something with the assistance of a third party.'" (Doc. 65 at 13) (quoting *In re Experian*, 2017 WL 3559007, at *4). The *In re Experian* court concluded "§ 1681i requires that a consumer point out an inaccuracy to a CRA without an intervening actor." 2017 WL 3559007, at *4.

The *In re Experian* court was addressing a letter submitted by a CRO with almost no involvement at any level from the consumer. In the instant case, the undersigned acknowledged that third party intervention may render a dispute "indirect." (Doc. 58 at 16). However, the court found Plaintiff's participation in drafting the letter is undisputed and, thus, his notification

---

[3] The distinction between a CRO and an attorney-in-fact, including the applicability of the FTC's guidance on this issue, is addressed in the court's memorandum opinion. *See* (Doc. 58 at 15).

to Experian was "direct."  (*Id.*).  In finding for Plaintiff on this issue, the court agreed with the FTC's reasoning that where a consumer does more than "merely convey" his dispute to a third party, who then passes it along to the CRA without the consumer's involvement, that consumer has directly notified the CRA of his dispute.  (*Id.*).

Experian points to three pieces of evidence in support of its contention that Plaintiff did not dispute his file "directly" because he "used a non-reseller third party."  (Doc. 65 at 14). However, each item supports the court's finding that Plaintiff disputed his file directly.  (Doc. 65 at 12) (citing Docs. 39-2, 39-3, and 40).[4]

The first piece of evidence is a portion of Plaintiff's interrogatory responses in which he stated: "I asked my lawyer to send the letter he and I drafted together." (Doc. 39-2 at 10).  This statement supports the court's finding that Plaintiff had some role in drafting the dispute letter. As the court explained, Plaintiff's participation renders his dispute direct.  (Doc. 58 at 16).  Next, Experian cites the following portion of Plaintiff's testimony:

> A. We put together another letter and said that Portfolio had said they were dismissing the case . . . [T]he letter asked why it hadn't been taken off, why it was still being reported.
> Q. So you wrote letters to the credit reporting agency, is that right?
> A. Yes, sir.

(Doc. 39-3 at 18).   Again, this testimony supports the court's conclusion that Plaintiff directly disputed the contents of his report.

Finally, Experian points to Plaintiff's dispute letter, its attachments, and the envelope it was sent in.  (Doc. 40 at 27-32).  As discussed in the court's order, the letter itself has numerous indicators it was written by Plaintiff and contains no indication that it was written by someone else.  (Doc. 58 at 15-17).  It would have been unreasonable for anyone considering Plaintiff's

---

[4] Experian's page citations are to the original documents, whereas the court's citations are to its own pagination as stamped on the docket filings.

letter itself (as opposed to the envelope it was mailed in) to conclude the letter did not present a "direct" notification from Plaintiff of his dispute.

Thus, Experian's citations do not support its contention that Plaintiff failed to dispute his file directly—even though his attorney was clearly involved on some level.   (Doc. 58 at 15) ("Further, as other courts have concluded, the FTC's guidance does not apply to attorney letters written on a plaintiff's behalf, since the guidance in questions relates to credit repair organizations and other third parties which do not have an attorney-client relationship with the consumer.").[5]

Experian quotes from *In re Experian* in support of its assertion that attorney involvement is fatal to Plaintiff's claim:

> That the non-reseller third party that transmitted Plaintiff's dispute to Experian was Plaintiff's attorney is, as Judge Snow noted, irrelevant: 'That Experian has reinvestigated disputes initiated by a consumer's attorney does not change this conclusion.    The scope of the FCRA's reinvestigation requirement does not expand based on a CRA going beyond its statutory duty.'   *In re Experian*, 2017 WL 3559007 at *6, n.7.

(Doc. 65 at 14).   However, this language is taken out of context.   In the footnote quoted above, the *In re Experian* court merely addressed the fact that, on occasion, Experian has reinvestigated disputes which were submitted by an attorney.   Rather than relying on these past reinvestigations to declare, as a matter of law, that any attorney letter must trigger the reinvestigation duty under § 1681i(a)(1)(A), the court distinguished these situations as ones in which Experian may have

---

[5]   The court notes § 1681s-2(a)(8)(G), which now directs the Consumer Financial Protection Bureau ("CFPB") to promulgate regulations defining the circumstances under which reinvestigation is required, also provides that data furnishers are not required to reinvestigate a dispute "if the notice of the dispute is submitted by, is prepared on behalf of the consumer by, or is submitted on a form supplied to the consumer by, a credit repair organization."   15 U.S.C. § 1681s-2(a)(8)(G); *see also In re Experian*, 2017 WL 3559007, at *5.    This language is yet another example of the FCRA's special treatment of CROs, which Experian seeks to expand in ways not supported by the statute.

"gone beyond its statutory duty." The *In re Experian* court's point is that, while the CRA may have conducted reinvestigations in response to an attorney letter before, prior treatment of attorney letters did not, by itself, establish a duty to reinvestigate in response to a letter from a CRO. Thus, the *In re Experian* court was making the same point the court has made here: unlike a letter from a CRO, communications from a consumer's attorney are not categorically excluded from the statutory language of § 1681i(a)(1)(A). Instead, the proper analysis looks to whether the consumer has participated in notifying the CRA of his dispute.

For this and the other reasons discussed above, Experian has failed to present persuasive—let alone controlling—authority which would require reconsideration here. Accordingly, the motion to reconsider is due to be denied to the extent it relies on an intervening change in controlling law.

## B. Manifest Injustice

Next, Experian asserts the court's "finding of willfulness is a manifest injustice." (Doc. 65 at 15-17). Experian argues that, "[a]s a matter of law, a consumer reporting agency cannot possibly be found to have acted willfully in violation of the FCRA where two district courts expressly have found that Experian's actions in this case would not constitute *any* violation of the FCRA." (*Id.* at 6) (emphasis original) (citing *Safeco*, 551 U.S. 47).

The court did not find Experian acted willfully. Instead, the court held the evidence could support a jury's finding of willfulness and, thus, Experian's motion for summary judgment failed to demonstrate there was no genuine dispute of material fact. (Doc. 58 at 18-21). The court stated:

> Experian's policy, such as it is, is not supported by the statutory language of the FCRA. Although the FCRA provides a mechanism by which a CRA can determine a dispute is 'frivolous or irrelevant' and decline to investigate, Experian did not comply with that provision here. To the extent Experian followed a

> procedure, a reasonable factfinder could determine that procedure was 'objectively unreasonable' and, therefore, willful. *Safeco*, 551 U.S. at 69-71. A reasonable factfinder could also conclude that, though "flawed," Experian's procedure was 'merely careless' and, thus, its conduct was only negligent. *Id.* at 78.

(*Id.* at 20). This passage makes clear that the issue of Experian's intent is an unresolved factual question. Therefore, Experian's motion is due to be denied to the extent it relies on the assertion that this court has made a "finding of willfulness." Further, Experian offers no analysis as to what constitutes a "manifest injustice." Accordingly, the motion to reconsider is due to be denied to the extent it relies on the assertion a manifest injustice has occurred.

### C.  Clear Factual Error

Finally, Experian asserts the court has committed clear error because its description of Experian's conduct is in conflict with the evidentiary record. (Doc. 65 at 7). Experian takes specific exception to the following statement by the court: "Experian followed a procedure which looks to whether an envelope is suspicious and, without regard to the envelope's contents, follows procedures which do not track the prescriptions of the FCRA." (*Id.*) (quoting Doc. 58 at 18). This quotation is the court's description of the most Experian could possibly show on the basis of the evidence submitted. In other words, the contents of Plaintiff's letter are so clearly a dispute from the consumer himself that any other conclusion would be unreasonable. More importantly, however, the court found it is disputed whether Experian actually followed any procedure at all.

Renewing its contention that it followed procedures which are reasonable as a matter of law, Experian points to the testimony of Jason Scott, who "explained Experian's fraud detection procedures." (Doc. 65 at 7). "Mr. Scott testified that Experian's mail room personnel are trained to determine whether mail is suspicious by 'looking at the envelope in postmarks, the

handwriting or lack thereof for an address and return address.'" (*Id.*). According to Experian, Mr. Scott testified that Experian's personnel determined the envelope containing Plaintiff's letter "had suspicious characteristics"—*i.e.*, indicia of fraud. (*Id.* at 7-8).

Mr. Scott further explained that "Plaintiff's mail, like all in-coming mail at Experian, was opened, digitally scanned, and analyzed." (*Id.* at 8).   Scott testified that the contents of Plaintiff's letter were reviewed and found to lack proof of participation on Plaintiff's part, which is why it was deemed suspicious. (*Id.* at 9).   "Finding the outside [of the envelope] to be suspicious, and a lack of proof of participation inside, Experian sent a 'suspicious mail' notice to Plaintiff" pursuant to its fraud protection procedures. (*Id.*).   In Experian's view:

> That clearly was the right call.   That is, Experian's fraud detection procedures worked exactly as they were supposed to work—namely: They *correctly* identified a letter that was not sent by the consumer.

(*Id.* at 10) (emphasis original).

The court disagrees with Experian's characterization of the evidence.   Scott testified Paz Salinas, an Experian employee in Santiago, Chile, "handled this dispute." (Doc. 37-1 at 9). While Scott testified what Salinas's training "would have been," he conceded he did not know whether Salinas received the training he described. (*Id.* at 10).   Rather than having personal knowledge of how she was trained, Scott said, "It's what my expectation would be." (*Id.*). Similarly, Scott demonstrated a lack of personal knowledge when asked to confirm whether Salinas spoke English.   (*Id.*) ("Well, that would be a requirement of joining Experian so … [b]ased off what I know of Experian and our operations in Chile and outside the United States, yes, that would be a requirement of her employment.").

As to whether Salinas was the only person who "processed Mr. Younger's dispute," Scott responded, "[B]ased off [the Experian disclosure log], I would say that there were no other

employees who were responsible for processing this piece of mail." (*Id.*).  However, when asked to explain how Plaintiff's letter came to be processed by Salinas in Chile, Scott testified that Allen, Texas is the destination for all mail correspondence arriving through the United States Postal Service.  (*Id.* at 13).  Mail arriving there is "opened and all attachments or all enclosures and even the envelope are scanned." (*Id.*).  After scanning, there is an audit of the scan to confirm Experian has a legible copy of the materials it received.  (*Id.*).  Then the mail is "routed to the appropriate department who would respond to those types of requests"—for example, requests for credit score purchases go to one department, and "if it's a dispute, it would be routed to a department who handles disputes." (*Id.*).

Scott surmised Plaintiff's mail was "opened, physically opened, in Allen, Texas." (*Id.*).  Plaintiff's envelope and all its contents were scanned.  (*Id.*).  When asked whether a human normally then determines whether the mail should be routed one way or another, Scott responded, "Not necessarily.  Experian has several post office boxes and those . . . P.O. Boxes have a given function." (*Id.*).  The mailbox where mail is received largely determines how it is routed.  (*Id.*).  When asked if the "mail department" goes beyond "just looking at the P.O. Box," Scott said: "I'm not certain if they read the contents of the letter and using that to guide where— which queue." (*Id.*).

Plaintiff's counsel then asked Scott about Salinas's role in identifying the letter as suspicious mail, and the following exchange took place:

> A. Other personnel would have made that determination, not Miss Salinas.
> Q. Okay. Who?
> A. Well, in the process of receiving the mail correspondence, your exact question of who, that I don't know.
> Q. Is there any way to find out who determined this was suspicious or not?
> A. It's possible.
> Q. Okay. How would we do that?

A. Well, I would access the on-line system used to access the piece of mail correspondence and then would [*sic*] I would attempt to see if there is a notation or any indication that somebody had identified this as being suspicious and if there were, I would respond with his or her name.

Q. Okay. So it is knowable and findable who determined this was suspicious?

A. It's possible.

Q. Has that been done in this case?

A. Not that I'm aware of.

Q. Has anyone asked you to do that?

A. No.

Q. As we sit here today, do you know if Paz Salinas or someone else made the determination that this was suspicious correspondence?

A. Well, as my prior testimony indicated, I believe it would be somebody prior to Miss Salinas' involvement that would have made that determination based off of Experian's policies.

Q. Would that person have been in Allen, Texas?

A. Yes, it likely would have.

Q. Would they be working in the mail room at Experian?

A. That would be my understanding.

(*Id.* at 14). Thus, while Experian has established Plaintiff's letter was identified as suspicious, it cannot say when, where, or by whom. Scott testified as to the procedures Experian employees are *expected* to follow, but he could only speculate that he "believed it would be somebody" prior to Salinas's involvement who deemed the letter suspicious. These contentions are in conflict with Scott's statement that "there were no other employees who were responsible for processing this piece of mail." (*Id.* at 10).

It is clear from the record that Scott had no personal knowledge of what actually took place in this case. Although it "would be [his] understanding" that the person who made the "suspicious mail" determination "likely would have" been in Allen, Texas, he did not and could not say for sure. While Scott contended he could find out, no further evidence has been submitted on this point. Scott most certainly did not, as Experian describes it, create an "undisputed factual record" that Experian "analyzed" the contents of the letter. (Doc. 65 at 17).

13

Experian cannot show, as a matter of law, what considerations contributed to the result that Plaintiff's dispute was not reinvestigated.   Experian cannot establish what policy, if any, was applied here, and this remains an open and disputed question of material fact.   Having failed to show the court's order denying summary judgment relies on a clear factual error, Experian's motion is due to be denied.

## IV.   CONCLUSION

For the reasons discussed above, the motion to reconsider (Doc. 65) is **DENIED**.   The parties are **ORDERED** to participate in mediation as set forth in the court's order of November 6, 2017.   (Doc. 72).

**DONE** this 30th day of November, 2017.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE