FILED
2018 Jun-20  PM 05:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SHAUN YOUNGER, | CASE NO.: |
| Plaintiff, | 2:15-cv-00952-SGC |
| v. | OPPOSED |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ORAL ARGUMENT REQUESTED |
| Defendant. | |

## DEFENDANT EXPERIAN'S COMBINED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION TO ALTER OR AMEND THE JUDGMENT, AND MOTION FOR NEW TRIAL

COMES NOW, Defendant Experian Information Solutions, Inc. ("Experian"), by and through undersigned counsel, and hereby renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), moves to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), and alternatively, moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A).

## INTRODUCTION

The verdict in this case, including but not limited to the breathtaking $3 million punitive award, cannot stand. Two decades ago, the U.S. Supreme Court

overturned a strikingly similar Alabama punitive judgment—$2 million in that case, on top of only $4,000 in compensatory damages—observing that "[w]hen the ratio [of punitive to compensatory damages] is a breathtaking 500 to 1 . . . the award must surely 'raise a suspicious judicial eyebrow.'" *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) (citation omitted).

That "suspicious judicial eyebrow" is fully warranted in this case. The grossly disproportionate punitive verdict is not only unconstitutionally excessive, though it surely is that. It also highlights that the jury was systematically incited by Plaintiff's counsel to punish Experian on bases that are not permissible under the law and were without foundation in the evidence. Among other things, Plaintiff:

- Argued to the jury, with literally no foundation in the evidence, that Experian's entire policy of identifying suspicious disputes was a pretext for selling products to consumers who called its dispute line;

- Repeatedly cited a settlement agreement, in violation of this Court's *in limine* order, to support this evidence-free claim, *and flatly misrepresented the settlement agreement* as if it provided such support, which it indisputably did not;

- Invited the jury to punish Experian for *all* applications of its suspicious mail policy—even where the mail at issue is truly suspicious—without

identifying even a single other case in which the policy was wrongly applied to a legitimate dispute; and

- Successfully urged the jury to impose a $3 million punishment geared to Experian's net profits rather than to the conduct at issue in this case.

The net result of these improper influences was a punitive to compensatory damages ratio that outstripped even the "breathtaking 500 to 1 ratio" of *BMW v. Gore*—all for merely sending Plaintiff a letter asking him to call Experian to confirm that he wished to dispute his credit file information. *BMW*, 517 U.S. at 583.

Separate and apart from the punitive damages verdict, Plaintiff's egregious emphasis on an inadmissible settlement agreement to spin a narrative of corporate misconduct with no support in the evidence—coupled with counsel's shocking misrepresentation of the contents of that settlement—independently requires a new trial. Further, Plaintiff's sole theory of willfulness at trial, that Experian's entire suspicious mail policy was unlawful, is unsustainable as a matter of law. But at a minimum, the punitive damages award must be drastically reduced to comply with constitutional limits.

## STANDARDS

### A.   Renewed Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) provides that a "movant may file a renewed motion for judgment as a matter of law and may include an alternative or

joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).  "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*  "[A] court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1130 (11th Cir. 2018) (citation and internal quotation marks omitted).  A renewed motion for judgment as a matter of law may raise grounds previously raised and those that are "closely related" to those raised in the initial motion.  *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1261 (11th Cir. 2016).

### B.   Motion to Alter or Amend Judgment

"Under Rule 59(e) of the Federal Rules of Civil Procedure, a court may alter or amend a judgment if there is newly-discovered evidence or manifest errors of law or fact." *Metlife Life & Annuity Co. of Connecticut v. Akpele*, 886 F.3d 998, 1008 (11th Cir. 2018) (citing *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007)).  Here, Experian urges there are manifest errors of law and fact.

### C.   Motion for New Trial

Under Rule 59(a)(1)(A), "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows: (A) after a jury trial, for any

reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  This court has discretion to grant a new trial "not just on evidentiary weight, but on other grounds including improperly admitted evidence, improper jury charge, jury confusion, and prejudice to a party's rights."  *Benson v. City of Atlanta*, No. 17-12677, 2018 WL 416773, at *2 (11th Cir. Jan. 16, 2018) (citing *J.A. Jones Const. Co. v. Steel Erectors, Inc.*, 901 F.2d 943, 944 (11th Cir. 1990)).

## ARGUMENT

1.  ### PLAINTIFF'S COUNSEL'S INFLAMMATORY AND MISLEADING REFERENCES TO AN UNRELATED SETTLEMENT WARRANT A NEW TRIAL.

   A.   #### In Granting Experian's Motion In Limine, This Court Already Held That Plaintiff's Counsel Could Not Reference Settlements Entered Into By Experian.

Experian was severely prejudiced by counsel's multiple—and highly misleading—references to a settlement entered into by Experian and others, which Plaintiff repeatedly used to (falsely) suggest that Experian markets products to consumers calling its dispute line.  Counsel did this in the face of the Court's *in limine* ruling that references to such other settlements were irrelevant and prejudicial. On May 7, 2018, Experian filed its Unopposed Motion In Limine No. 4 ("MIL No. 4"), which sought to preclude any reference to:

   (1) any other lawsuits, verdicts, *investigations*, complaints, or similar actions (*including any complaint, investigation, or administrative action by . . . State Attorneys General*, or other governmental entity) filed or instituted against Experian; (2) the number of such actions; and

5

(3) any *consent decrees or settlements entered into by Experian and any governmental entity* or consumer.

(Doc. 102 at 1-2 (emphases added).)   Experian brought MIL No. 4 on several grounds—including, in short, that such evidence "is irrelevant and will be highly prejudicial to Experian, serving only to confuse the jury and waste judicial resources"; "allegations contained in any Other Actions or Settlements present unsubstantiated claims and statements by declarants who are not on Plaintiff's witness list, and are therefore inadmissible as hearsay"; "[s]uch evidence . . . is not listed in Plaintiff's original exhibit list (Doc. 89) or Plaintiff's exhibit list supplement (Doc. 95)"; and "evidence of settlements or compromise is inadmissible." (Doc. 102 at 2-3.)   This Court agreed, and in granting MIL No. 4, explained that "[s]uch evidence is irrelevant to the instant action and prejudicial for the purposes of Rule 403[,]" and that "[e]ven if such evidence has some probative value, it would likely confuse and mislead the jury from evaluating Plaintiff's claims in this case." (Doc. 111 at 5.)

Those very reasons for excluding this evidence bore out at trial when, after not opposing Experian's MIL No. 4 or objecting to the Court's order, Plaintiff's counsel did the very thing this Court ordered him not to—he referenced and

questioned Experian's witness about a settlement[1] between Experian, the other national credit reporting agencies, and 31 states—and did so in a way that fundamentally misrepresented the settlement.  (*See generally* Trial Tr. at 257:17 – 261:15 ("[L]ess than a month after y'all sent the letter to Mr. Younger, Experian entered into an assurance of compliance with 31 states including the State of Alabama in which you agreed or it was found that you engaged in improper disclosure or marketing practices relating to the sale of direct-to-consumer products to consumers during credit report dispute phone calls? Are you aware of that? . . . ."); *see also* Ex. 1.)   Experian's counsel objected on multiple occasions to these references.  (Trial Tr. at 259:22, 285:11-14 (sidebar in which Experian articulated its objections on the grounds of improper argument and MIL No. 4 grounds).)  Without being provided a copy of the Assurance of Voluntary Compliance ("AVC"), as it was never tendered into evidence, the Court overruled Experian's objections each time.  (Trial Tr. at 259:23, 285:16.)

---

[1] An "Assurance of Voluntary Compliance" is a settlement agreement, as the document itself makes clear in the first sentence.  *See* Ex. 1 ("This Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance ('Settlement' or 'Assurance') is entered into between . . . ."); *see also, e.g.*, Press Release, Governor's Office of Consumer Protection Announces $6 Million Settlement with Credit Reporting Agencies, May 20, 2015, found at http://consumer.georgia.gov/news/press-releases/view/governor-s-office-of-consumer-protection-announces-6-million-settlement-with-credit-reporting-agencies on May 31, 2018 (referring to the Assurance of Voluntary Compliance as "the settlement").

The entire purpose of a motion in limine is to raise these issues outside the presence of the jury "to exclude anticipated prejudicial evidence *before the evidence is actually offered*." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (emphasis added). If Plaintiff's counsel wanted to challenge this ruling and argue that this excluded evidence should now be deemed admissible for a particular purpose, he should have made that argument at trial *before* violating the Court's order—by seeking a sidebar or otherwise attempting to explain how this evidence would not be in violation of the Court's prior order. He did none of those things.

Only after Experian's counsel requested to see a copy of the AVC did Plaintiff's counsel provide his sole argument for why it should be admissible in an offhand comment: "It's for impeachment" (Trial Tr. at 258:1-4)—presumably impeachment of the witness's testimony that Experian did *not* market to consumers calling its dispute line. This settlement was not legitimate impeachment material, as the AVC was not a statement of any facts, let alone an admission of anything by Experian. To the contrary, the AVC expressly provides that "[t]he CRAs expressly deny any violation of and liability arising from any state, federal, or local law, and further expressly deny that any current or prior practice of any CRA . . . is or was

deficient in any respect." (Ex. 1 at 34-35.)  Nor does the AVC purport to find that Experian marketed to consumers on dispute phone calls.[2]

Moreover, Federal Rule of Evidence 408 expressly prohibits the admission of evidence of settlement statements *even for impeachment purposes.*  Fed. R. Evid. 408(a) ("Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction: . . . .").  Rule 408 was one of the grounds on which Experian's MIL No. 4 was based.  (Doc. 102 at 3.)  Because Plaintiff failed to request that the Court revise its prior order excluding this evidence, and there was no new basis for admitting or referencing the AVC, Plaintiff's counsel's questioning about the AVC and discussion of it in closing argument "was in direct violation of the district court's ruling and was thus highly improper." *McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990) (citing *Brown v. Royalty*, 535 F.2d 1024, 1028 (8th Cir. 1976); *Adams Labs., Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985)).

Furthermore, Plaintiff's counsel greatly compounded the prejudice from this "highly improper" conduct by blatantly misrepresenting the content of the AVC—

---

[2] Indeed, the AVC does not even *allege* such conduct by Experian.  It merely reports such marketing as one of various "concerns" raised by unidentified consumers about "the CRAs" collectively.  (Ex. 1 at 3.)  The AVC does not say anyone raised this "concern" about Experian— as opposed to another CRAs—let alone allege that the concern had any factual basis.

9

which, as noted, in no way admitted or purported to find that Experian had marketed

products to consumers during dispute calls.  It was therefore flatly false, and

manifestly prejudicial, for counsel to suggest that Experian "agreed or it was found"

in the AVC that Experian had engaged in such practices.  (Trial Tr. at 257:18–24.)

### B. Plaintiff's Counsel's Inflammatory And Prejudicial Treatment Of This Non-Evidence As Evidence In Closing Unfairly Prejudiced Experian And Requires A New Trial.

In addition to Plaintiff's counsel's misleading and "highly improper,"

*McWhorter*, 906 F.2d at 677, references to the AVC during cross-examination,

Plaintiff's counsel never tendered the AVC into evidence.  And no testimony

corroborated anything about the AVC.  (*See* Trial Tr. 257:2 – 260:16.)  As such,

there was *no actual evidence* tendered to the jury about the AVC.  Yet Plaintiff's

counsel relied heavily on this non-evidence in his closing argument—referencing

the AVC and uncorroborated implications about it no less than five times in his effort

to spin a damning narrative, based on no evidence, that Experian's entire suspicious

mail policy was a pretext for marketing to consumers with disputes.[3]  He even

---

[3] *See* Trial Tr. at 285:6-286:4 ("Why is it important that he call you? Well, you heard me talk to Ms. Methvin about that.  Experian, amongst others, had gotten into trouble because they were trying to sell credit reporting stuff, other products to people that would call in with these disputes. [objection, overruled] As I was saying, it's important to call in because they're going to sell you stuff.  Credit reporting.  And think about it.  Credit monitoring.  And what better customer for credit monitoring would you have than someone that has gotten a letter saying, Hey, we've gotten a suspicious request.  Better call us.  And as soon as we call, Got something we can sell you to protect you.  So think about it.  Experian is saving money on the front end by not investigating

invited the jury to make a credibility determination as if there were disputed evidence on this point.  (*See, e.g.*, Trial Tr. at 313:2-7 ("He talks about how it was a dedicated line, and, We certainly wouldn't sell anything to them.  Well, you have to take their word for it.  That's all we have.  *We have, what I talked about, a consent order entered into with 31 states' attorneys general, and you have Ms. Methvin's word for it. So you've got to decide which one you believe.*" (emphasis added)).)

These inappropriate and highly misleading references to the settlement agreement require a new trial.  "While counsel may resort to reason for deductions in his argument, he must restrict himself to the record for the facts."  *Rommel-McFerran Co. v. Local Union No. 369 I.B.E.W. AFL-CIO*, 361 F.2d 658, 661 (6th Cir. 1966) (holding that counsel's reference to a deposition not in evidence in closing constituted reversible error) (citing *Chesapeake & Ohio Ry Co. v. Richardson*, 116 F.2d 860 (6th Cir. 1941)).  "Where placing material facts not in evidence before the

---

up to 2,000 disputes a day.  And then they're making money on the back end selling things to concerned consumers that call in."); Trial Tr. at 286:11-14 ("Nothing in the law says, Hey, you get this option, and then if they call in, you can sell them stuff.  That's not how it's supposed to work, and yet that's the sham policy they've come up with."); Trial. Tr. at 286:25-287:2 ("And then the bonus is if 10 percent of those 2,000 call in, we got a chance to sell them something."); Trial Tr. at 287:4-7 ("Some bean-counter somewhere looked at, What does it cost us to investigate?  What aren't we selling enough of these products?"); Trial Tr. at 313:2-7 ("He talks about how it was a dedicated line, and, We certainly wouldn't sell anything to them.  Well, you have to take their word for it.  That's all we have.  We have, what I talked about, a consent order entered into with 31 states' attorneys general, and you have Ms. Methvin's word for it. So you've got to decide which one you believe.").

jury in final argument substantially prejudices a party, reversal is required." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 285 (5th Cir. 1975)[4] (reversing and remanding for a new trial, even though the opposing party did not object at trial, where counsel asserted in closing that a witness made an admission that the testimony in record did not support) (citing *Rommel-McFerran Co*, 361 F.2d at 661; *Berguido v. Eastern Air Lines*, 35 F.R.D. 200, 209-12 (E.D. Pa. 1964)).

In *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990), the Eleventh Circuit affirmed the trial court's decision to grant a new trial because counsel's closing argument focused on evidence expressly excluded by the court prior to trial. 906 F.2d at 677; *cf. Atkinson v. Yoder*, No. 0:15-CV-61716-UU, 2017 WL 1397407, at *3 (S.D. Fla. Mar. 22, 2017) (distinguishing *McWhorter* because there, "the trial court had issued a pre-trial order precluding reference to certain evidence," and implying in dicta that such a pre-trial order is a "circumstance[ ] that would show that the interest of substantial justice was compromised" (citing *McWhorter*, 906 F.2d at 677-78)). Indeed, "it is '[a] particularly indefensible tactic' to use 'closing arguments to bring before the jury damaging facts not in evidence

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to September 30, 1981.

and never established." *Lockamy v. Carrillo*, 432 F. App'x 283, 286 (5th Cir. 2011) (quoting *Edwards*, 512 F.2d at 284). [5] Because Plaintiff's counsel employed this "indefensible tactic," a new trial is the only adequate remedy.

## 2. PLAINTIFF'S TESTIMONY ESTABLISHED THAT HIS CLAIMED EMOTIONAL DISTRESS DID NOT RISE TO THE REQUIRED LEVEL.

Plaintiff's negligent noncompliance claim required actual damages, and the only damages presented were emotional distress. Within consumer protection cases in the Eleventh Circuit, the standard for recoverable emotional distress provides that "generalized evidence that [plaintiffs] were 'stressed out,'" "without any additional, specific detail, does not show that the [plaintffs] suffered significant emotional distress . . . as opposed to '[f]leeting or trivial anxiety of distress.'" *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1272 (11th Cir. 2014) (case arising from willful violation of stay in bankruptcy that caused plaintiffs to see their house advertised for foreclosure sale; affirming summary judgment for defendants)

---

[5] *See also Nelson v. City of Chicago*, 810 F.3d 1061, 1072 (7th Cir. 2016) (reversing denial of motion for new trial where the "attorney's questions on this subject were multiple and inflammatory" and "[t]he repeated references to [plaintiff]'s other lawsuits during closing argument were clearly intended to undermine [plaintiff]'s credibility and stir juror bias against him[,]" and holding that limiting instruction was insufficient to render the error harmless, as "the prejudice engendered by the erroneous admission of the evidence of other lawsuits was significant enough that the presumption [that juries follow the court's instructions] must give way"); *Brown*, 535 F.2d at 1028 (repeated, deliberate reference to evidence excluded by district court is clear misconduct and grounds for new trial); *Adams Labs., Inc.*, 761 F.2d at 1226 (plaintiff's counsel's reference to excluded evidence in direct contravention of the district court's order held to constitute prejudicial error).

(citation omitted); *cf. Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 n.5 (11th Cir. 2005); and cases cited in Doc. 115 at 6-10.  Here, Plaintiff's claim that he read one letter that made him "a little upset, a little aggravated, a little irritated as I read it" (Trial Tr. at 182:7-13 (quoting deposition transcript)) and "magnified" stress (Trial Tr. at 174:17 - 175:12; 224:24 - 225:3) from other sources is precisely the type of claimed distress rejected by the Eleventh Circuit in *Lodge* and *Akouri*.

**3.     THE COURT'S GRANT OF SUMMARY JUDGMENT ON TWO OF THE FOUR ELEMENTS OF THE NEGLIGENT NONCOMPLIANCE CLAIM RESOLVED DISPUTED ISSUES OF FACT AND CREATED JUROR CONFUSION AND UNFAIR PREJUDICE TO EXPERIAN.**

Plaintiff moved for (Doc. 36) and this Court granted partial summary judgment on a portion of a claim—that is, it held that Plaintiff satisfied the duty and breach elements of the negligent noncompliance claim.  (Doc. 58 at 21.)  This decision on two of four elements of one claim resolved disputed issues of material fact and prevented Experian from having the option of showing that it was not attempting to shirk its duty to reinvestigate—that is, having the jury determine whether the letter reasonably appeared to have come from Mr. Younger and, thus, whether Experian was even required to conduct a reinvestigation of Plaintiff's dispute.  (*See* Mot. for Summ. J. (Doc. 39) at 11-20; *see also* Mot. for J. as a Matter of Law (Doc. 115) at 10-12; Trial Tr. at 228:7-231:18; 267:1-9.)  As shown in the briefing on the Motion for Reconsideration (Doc. 65) and in opposition to Plaintiff's Motion (Doc. 41), the determination that "no reasonable factfinder could find the

March 30 letter's contents presented anything to suggest it was not 'from' Plaintiff"
(Doc. 58 at 15) at a minimum resolved disputed issues of material fact.

Yet, Plaintiff's counsel was permitted, over objection, to present evidence
related solely to the issue of whether Experian breached its duty to reinvestigate.
Indeed, over Experian's objections, the Court allowed Plaintiff's counsel
tremendous latitude with respect to presenting evidence on this issue that was not
before the jury, while simultaneously restricting Experian's ability to respond to this
evidence.  (*Compare* Trial Tr. 95:25-96:9; 137:1-139:14; 141:16-144:6; 150:7-
158:20; 230:18-23; 262:8-263:2; 263:23-264:7; 283:17-284:13 *with* Trial Tr. 6:4-
8:12; 100:22-101:8; 158:22-160:24.)  Counsel's decision to return to this issue time
and again demonstrates that genuine disputes of material fact remained that the jury
should have been permitted to decide.

The effects of this error were further amplified by the confusion resulting from
Plaintiff's counsel repeatedly misconstruing the Court's holding to Experian's
detriment.  On multiple occasions during opening argument, Plaintiff's counsel
referred to Experian's entire suspicious mail policy as "illegal."  (*See* Trial Tr. at
90:12-15 ("The evidence will be that this happens thousands of times a day and that
this has been the policy for many, many years, this illegal policy of not investigating
disputes."); Trial Tr. at 91:20-22 ("And to do that, we had to make certain of a few
things. The first was, was this policy actually illegal? As I said, the Court's already

15

said yes, so we checked that box.").)  Experian objected and the Court sustained the objection, providing a limiting instruction.  (Trial Tr. at 91:23, 92:4, 92:7-12.)

Then Plaintiff's counsel himself expressed confusion to the Court about how to talk about the negligence claim to the jury.  (*See* Trial Tr. at 196:9-21.)  The Court confirmed that it had only decided the duty and breach elements of the negligent noncompliance claim, as there is no negligent violation without causation and actual damage to a plaintiff.  (*See* Trial Tr. at 196:22 - 198:11.)

Yet before *and after* the sustained objection and that in-trial clarification of the Court's summary judgment holding, Plaintiff's counsel continued to misrepresent to the jury that the court had already decided that Experian negligently violated the FCRA.  (*See* Trial Tr. at 89:21-23, 288:20 - 289:1, 290:5-7.)  This confusion prejudiced Experian and illustrates further why the Court's partial summary judgment holding was in error.  "Summary judgment is designed to dispose of actions or claims."  *Baker Cty. Med. Servs., Inc. v. Summit Smith L.L.C.*, No. 3:05-CV-541-J-33HTS, 2007 WL 1229702, at *4 (M.D. Fla. Apr. 25, 2007). Although Rule 56(a) contemplates that a party may move for summary judgment on only part of a claim, "[i]t bears noting that while partial summary judgment serves as a valuable tool of judicial management that prunes the issues for trial, courts should not overlook possible negative consequences of unfair prejudice and jury confusion[; t]he risk of these potential consequences is especially prevalent when

16

partial summary judgment is granted on a single portion of one claim, as in the instant case." *Sec. & Exch. Comm'n v. Bankatlantic Bancorp, Inc.*, 661 F. App'x 629, 637 (11th Cir. 2016).

In light of this issue and those previously discussed, a new trial and reconsideration of the earlier summary judgment holding is the appropriate remedy. *See United States v. Alexander*, 237 F. App'x 399, 409 (11th Cir. 2007) ("[T]he cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error.") (internal quotation marks and citation omitted).

## 4.   EXPERIAN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S WILLFUL NONCOMPLIANCE CLAIM

Plaintiff bore the burden of proving, by clear and convincing evidence, that Experian willfully violated the FCRA when it asked for further information from Plaintiff before reinvestigating his dispute.  But Plaintiff presented no evidence indicating that Experian's decision to deem his letter suspicious was anything other than a single, isolated mistake by a low-level mailroom employee.  Such a one-time mistake is—at worst—"merely careless," *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007), and thus not a willful violation of the Act.

Unable to demonstrate willfulness with respect to the Plaintiff himself, Plaintiff's counsel argued to the jury that Experian's entire suspicious mail policy was a willful FCRA violation.  But various courts have already held that this same

17

policy does not violate the FCRA. Because these decisions are not "objectively unreasonable," *Safeco*, 551 U.S. at 70, Experian's suspicious mail policy cannot possibly constitute a willful violation of the FCRA, *see Lindsey v. Experian Info. Solutions, Inc.*, No. 2:15-CV-02353, 2017 WL 412889, at *4-5 (N.D. Ala. Jan. 31, 2017). Although this Court previously distinguished certain of these cases on the basis that they involved letters from credit repair organizations, Plaintiff's counsel completely undercut that distinction by arguing that Experian's entire policy of screening out suspicious mail—including mail from credit repair organizations—was a willful violation.

Accordingly, whether the focus is on Experian's treatment of the Plaintiff himself or on its use of the suspicious mail policy generally, there is no evidence—much less clear and convincing evidence—from which a reasonable juror could conclude that Experian willfully violated the FCRA. Experian is thus entitled to judgment as a matter of law on Plaintiff's willful noncompliance claim.

### A. There Is No Evidence That Experian's Identification Of Plaintiff's Letter As Suspicious Was Anything More Than A Single, Isolated Mistake That Cannot Possibly Be Considered A Willful Violation.

In order to prevail on his willful noncompliance claim, Plaintiff bore the burden of proving, by clear and convincing evidence, a statutory violation far worse than one that was "merely careless." *Safeco*, 551 U.S. at 69. But Plaintiff's evidence demonstrates—at most—a careless mistake by a mailroom employee.

18

As the trial revealed, it is unclear exactly why Plaintiff's letter was deemed suspicious by an individual employee in Experian's mailroom.  (*See, e.g.*, Trial Tr. at 117-119.)  Experian's mailroom employees are required to open and review letters, look for proof of consumer participation, and determine whether the letters are suspicious.  (*See* Trial Tr. at 126, 130, 260-61.)   While Experian strives for one hundred percent accuracy, mailroom employees are only human and occasional mistakes are possible—just like in any mailroom in any corporation or courthouse.

Here, there is no evidence that Experian's treatment of Plaintiff was due to anything more than an isolated, honest mistake by a mailroom employee.  There is no evidence that letters like Plaintiff's are routinely treated as suspicious.  While Plaintiff presented evidence that Experian deems a significant number of letters suspicious, the reality is that the vast majority of these letters *are in fact suspicious*, and Plaintiff offered no evidence to the contrary. [6]  Even assuming that a mistake with respect to Plaintiff's letter qualifies as negligent, it does not begin to rise to the level of a willful violation.  *See Safeco*, 551 U.S. at 69 (requiring a "risk . . . substantially greater than that which is necessary to make . . . conduct negligent" (citation omitted)).  No reasonable juror could conclude otherwise.

---

[6] Indeed, Plaintiff's counsel noted in closing argument "as far as we can tell in the research this is the first time this [suspicious mail] policy has come before a jury to look at in the history of this country.  I know of no other trial where this policy has been up here to look at."  (Trial Tr. at 280:4-7.)

19

**B.**   **Because Experian's Suspicious Mail Policy Is Not Objectively Unreasonable, It Cannot Constitute A Willful Violation of the FCRA.**

Unable to show that Experian acted willfully with respect to Plaintiff's letter, Plaintiff's theory at trial was that Experian's suspicious mail policy as a whole was a willful violation of the FCRA.  (*See, e.g.*, Trial Tr. at 280:3 ("We're here because of this policy."); *id.* at 287:19-21 ("And this case isn't about Shaun Younger because Shaun Younger is just an example of what happens when this policy is applied. That's all he is."); *id.* at 289:13-15 ("I told you, and I will stand by it, that this case is not driven on the harm to Mr. Younger.  It's driven by Experian's policy.").) Under *Safeco*, however—as this District has already held—Experian's suspicious mail policy cannot constitute a willful FCRA violation because it is not objectively unreasonable.

To prove a willful violation under *Safeco*, Plaintiff must demonstrate that Experian engaged in conduct that was clearly unlawful under then-existing law.  551 U.S. at 70.  Willfulness liability requires more than a merely "erroneous" reading of the statute—it requires conduct so plainly unlawful that it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time." *Id.* at 69-70 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), a qualified immunity case).  Where an interpretation of the statute permitting the defendant's conduct "could reasonably have found support in the courts," a willfulness finding is

20

precluded.  *Id.* at 70 n.20; *see also Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009) (holding that Experian's conduct was not willful because Experian acted in accordance with an objectively reasonable interpretation of the FCRA).

The application of this rule to Experian's suspicious mail policy is simple: not only "could" Experian's policy "reasonably have found support in the courts"—*it already has* found support in the courts.  At least two other district courts and one affirmed on appeal have held that *this same policy does not violate the FCRA.  See Turner v. Experian Info. Sols., Inc.*, No. 3:16-CV-630, 2017 WL 2832738, at *5 (N.D. Ohio June 30, 2017) ("[T]his Court find[s] Experian's suspicious mail policy is reasonable because Experian has a duty not only to maintain accurate consumer credit information, but also to ensure the confidentiality of that information."), *aff'd mem.*, No. 17-3795 (6th Cir. Mar. 1, 2018); *In re Experian Info. Sols., Inc.*, No. CV-15-01212-PHX-GMS, 2017 WL 3559007, at *8 (LEAD CASE) (D. Az. Aug. 17, 2017) (Snow, J.) (granting summary judgment to Experian, and dismissing all pending "suspicious mail" cases).  In light of these cases and the lack of any specific guidance from the Eleventh Circuit on this particular issue, Experian's policy is not objectively unreasonable and thus cannot be deemed a willful violation.  *See Lindsey*, 2017 WL 412889 at *4-5 (holding that Experian's suspicious mail policy is not objectively unreasonable).

In rejecting Experian's willfulness argument, this Court reasoned that—unlike in *Turner* and *In re Experian*, which involved letters from credit repair organizations—here the Plaintiff participated in writing the letter. (*See* Doc. 73 at 5-6.)  At trial, however, Plaintiff made no argument that Experian's failure to distinguish his letter from other, truly suspicious, letters was more than negligent. Instead, Plaintiff's entire argument was that the whole policy of screening out *any* suspicious mail was a willful violation. (*See* Trial Tr. at 283:10-16; 285:19 - 287:21.) This is unsustainable under *Safeco*, both because there is no basis on which a reasonable jury could find the *whole policy* to be willful, and because (as demonstrated by *Turner* and *In re Experian*) a court could clearly have found the overall policy lawful.  Given how Plaintiff's counsel chose to litigate this case before the jury, the reason for the Court's denial of Experian's *Safeco* argument no longer applies.  The jury's willfulness finding therefore cannot stand, regardless of whether the jury relied on Experian's treatment of the Plaintiff himself or on its suspicious mail policy generally.

## 5. THE JURY'S PUNITIVE DAMAGES AWARD IS CONSTITUTIONALLY EXCESSIVE

The jury found that Plaintiff suffered $5,000 in actual damages, yet awarded an extraordinary $3 million in punitive damages, an amount 600 times the actual damages award.  This punitive damages award is constitutionally excessive.  This ratio exceeds even the "breathtaking 500 to 1" overturned by the Supreme Court in

*BMW v. Gore*, and is far in excess of the ratios that have been permitted in other FCRA cases involving far more reprehensible conduct.  517 U.S. at 583.

Further, this massive award clearly reflects that the jury was improperly swayed by Plaintiff's counsel's extraneous and impermissible arguments for punishing Experian.  As a result, Experian was inappropriately punished based on the groundless claim that it harmed non-parties by trying to sell them products on its dispute hotline.  It was punished for conduct related to its suspicious mail policy that allegedly harmed non-parties, even though that conduct was legal where it occurred.  It was punished for the nationality of its employees.  And it was punished for its size and profitability.  Because the jury's verdict was based on these impermissible factors, it should be stricken in its entirety.  At the very least, the $3 million punitive damages award should be drastically reduced.

### A.    <u>The Punitive Damages Award Violates Due Process.</u>

The jury's $3 million punitive damages award fails as a matter of law because it violates Experian's right to due process.  "[I]t is well established that there are procedural and substantive constitutional limits on [punitive damages] awards." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  The Due Process Clause "prohibits the imposition of grossly excessive or arbitrary

punishments on a tortfeasor." *Id.* (citation omitted).[7] "The reason is that '[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty'" that may be imposed. *Id.* at 417 (citation omitted). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417. Accordingly, "a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999) (citing *BMW*, 517 U.S. at 585).

Under *State Farm*, courts reviewing punitive damages awards are instructed to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." 538 U.S. at 418 (citing *BMW*, 517 U.S. at 575). Several courts have taken the position that the third *State Farm* guidepost—the difference between

---

[7] Although *State Farm* involved the Due Process Clause of the Fourteenth Amendment and punitive damages awarded under state law, "[t]he same rules apply with equal force to punitive damages awarded under federal law, governed by the Due Process Clause of the Fifth Amendment." *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 258 n.7 (4th Cir. 2017).

the amount of a particular punitive damages award and comparable civil penalties— "provides little assistance in FCRA suits." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 152 (4th Cir. 2008) (internal quotation marks omitted); *see Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007); *Daugherty*, 701 F. App'x at 259.  But even without that third guidepost, the first two guideposts make clear that the jury's $3 million award is grossly excessive.

*First*, under any interpretation of the evidence, Experian did not engage in unusually "reprehensible" misconduct.  This is not a case where a credit reporting agency persistently refused to correct an error after multiple contacts.  At worst, Plaintiff read one letter and experienced a very brief delay—less than 2 months— before his credit information was corrected.  Plaintiff was not denied credit or harmed in any way as a result of the information Experian reported and he did not miss work.  (*See, e.g.*, Younger Dep. Tr. at 86:23 - 87:11; Trial Tr. at 219:13-17.)

Incapable of demonstrating any damage to his credit, finances, or employment, Plaintiff testified that he suffered anxiety as a result of Experian's letter asking him to call a toll-free number.  The harm of being asked to call a telephone number to confirm your identity is, at most, extremely trivial.  It is not "physical" harm, unlike in many cases involving large punitive damages awards.  *State Farm*, 538 U.S. at 419 (listing factors courts consider in determining whether misconduct was reprehensible).  Any harm to Plaintiff was not "the result of intentional malice,

25

trickery, or deceit[.]" *Id.* And Experian's mailing of the letter did not "evinc[e] an indifference to or a reckless disregard of the health and safety of others[.]" *Id.*

Moreover, there is no indication that Experian's conduct "involved repeated actions[.]" *Id.* As discussed above, there is no evidence that Experian's treatment of Plaintiff was due to anything more than a single mistake by a mailroom employee. Such an "isolated incident" is—at most—careless and cannot be fairly characterized as "reprehensible." *Id.*

*Second*, the jury verdict's 600:1 disparity between the actual and punitive damages is unreasonable and disproportionate. While the Supreme Court has declined to impose a bright-line ratio that a punitive damages award cannot exceed, it has made clear that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. The jury awarded Plaintiff $5,000 in actual damages. Applying the single-digit, 9:1 ratio implicitly authorized by the Supreme Court, the absolute maximum punitive damages award here should be $45,000—far short of the $3 million awarded by the jury.

Although the Supreme Court has not enforced rigid limits on punitive damages awards, it has made clear that very "few awards" can acceptably exceed a single-digit ratio—and those will generally involve "'a particularly egregious act.'" *Id.* (citation omitted). Because Experian's conduct was not particularly egregious in

this case, there is no reason to think this is one of the "few" cases the Supreme Court had in mind when it suggested that exceeding a 9:1 ratio may be constitutionally permissible.

The jury's $3 million award and its 600:1 ratio of punitive damages to actual damages are also completely out of step with awards approved in other FCRA cases involving far more egregious conduct by the defendant. Counsel is unaware of any FCRA case in which a circuit court applying *State Farm* has approved a punitive damages award anywhere near $3 million dollars or a ratio of punitive damages to actual damages anywhere near 600:1. Ratios in the single digits are more typical in FCRA cases. *See, e.g.*, *Cortez v. Trans Union, LLC*, 617 F.3d 688, 695 (3d Cir. 2010) (affirming $100,000 punitive damages award (a 2:1 ratio to compensatory damages) after the district court remitted the award down from $750,000 (a 14:1 ratio)); *Bach*, 486 F.3d at 152 (reducing punitive damages from over $2.6 million to $400,000, a 1:1 ratio to the compensatory damages).

The Sixth Circuit's decision in *Bach* is illustrative. *See* 486 F.3d 150. The misconduct in *Bach* was far worse than anything Experian allegedly did here. The defendant there "continued to report unfavorable credit information regarding Bach even after receiving notification from Bach, an elderly widow, that the information was inaccurate." *Id.* at 155. As a result, Bach had a credit card application denied and "was not able to obtain [a] mortgage on the terms she sought." *Bach v. First*

27

*Union Nat'l Bank*, 149 F. App'x 354, 361 (6th Cir. 2005). The defendant also placed a series of phone calls that Bach found harassing. *Id.* at 357. The jury awarded Bach $400,000 in compensatory damages and over $2.6 million in punitive damages. 486 F.3d at 152. On appeal, the Sixth Circuit found this 6.6:1 ratio of punitive damages to compensatory damages "'alarming,'" and held that a punitive damages award of $400,000 (*i.e.*, a 1:1 ratio) "constitutes an appropriate limit on punitive damages in this case." *Id.* at 156 (citation omitted). If a 6.6:1 ratio is "alarming" with respect to conduct more reprehensible than Experian's, it is hard to see how a 600:1 ratio could possibly be constitutionally permissible here.

Undoubtedly, there are some FCRA cases involving relatively small compensatory damages awards in which double-digit ratios of punitive damages to actual damages have been approved. *See Saunders*, 526 F.3d at 145 (affirming $80,000 punitive damages award, a 80:1 ratio); *Daugherty*, 701 F. App'x at 248-49 (reducing a $2.5 million punitive damages award (a 408:1 ratio) to a maximum of $600,000 (a 98:1 ratio)). But neither of these cases approved a *triple-digit* ratio or a *seven-digit* award like the verdict imposed here. And—like *Bach*—both of these cases involved conduct far worse than Experian's. In *Saunders*, defendant's "intentional misconduct and longstanding refusal to correct its errors" lowered plaintiff's credit score substantially, making it impossible for him to obtain a new loan at a favorable interest rate and increasing his financial vulnerability. 526 F.3d

28

at 146-47, 153.  And in *Daugherty*, the defendant "repeatedly failed to correct Daugherty's erroneous account information over a 17-month period, despite receiving multiple letters from Daugherty, governmental inquiries, and multiple dispute verification requests."  701 F. App'x at 259-60.  As a result, Daugherty "faced potential foreclosure of his home[.]"  *Id.* at 259.

In contrast, Plaintiff was simply asked to dial a phone number.  *Saunders* and *Daugherty* thus provide no support for the imposition of a double-digit ratio of punitive damages to actual damages here—much less the triple-digit ratio imposed by the jury.

### B. <u>The Jury Was Improperly Swayed By Plaintiff's Counsel's Extraneous And Impermissible Arguments For Punishing Experian.</u>

The only explanation for the excessive punitive damages award is that the jury was inappropriately influenced by the irrelevant, misleading, and improper arguments presented by Plaintiff's counsel.  *See BMW*, 517 U.S. at 583 ("When the ratio is a breathtaking 500 to 1, . . . the award must surely 'raise a suspicious judicial eyebrow.'" (citation omitted)).  The Eleventh Circuit "see[s] the jury's award of excessive damages as proof that Plaintiff's counsel's misconduct probably influenced the jury."  *Christopher v. Fla.*, 449 F.3d 1360, 1368 n.11 (11th Cir. 2006).  As a result of counsel's arguments, the jury punished Experian for at least four impermissible reasons, as set forth below:

*First*, the jury based its excessive punitive damages award on the improper and unfounded argument that Experian used its dispute hotline to sell products to individuals not before the Court.   As explained above, Plaintiff's counsel violated this Court's order by repeatedly referencing a settlement agreement that Experian reached with 31 states.   Plaintiff's counsel referred to the settlement agreement at least five times in his closing argument, contending that it demonstrated Experian's practice of trying to sell its products to consumers who called its dispute number. But the settlement agreement provides no indication whatsoever that Experian has *ever* used its hotline to sell products.   The only evidence in the record is Ms. Methvin's testimony that dispute agents do *not* try to sell any products.   (*See* Trial Tr. at 257:2 - 260:16.)

In addition to misleading the jury, the references to the settlement agreement impermissibly induced the jury to punish Experian for alleged harm to non-parties. As the Supreme Court held in *Philip Morris USA v. Williams*, 549 U.S. 351 (2007), a jury may not "use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties."   *Id.* at 355.   But that is exactly what happened here.   Plaintiff's counsel pressed for a large punitive damages award to punish Experian for allegedly trying to sell products to individuals other than Plaintiff.   (*See, e.g.*, Trial Tr. at 285:7-20; 285:19 - 286:4; 287:19-21.)   Even worse, counsel invited the jury to punish Experian for alleged harm that *other* credit

30

reporting agencies inflicted on non-parties. (*See, e.g.*, Trial Tr. at 292:17-20 ("[Experian is] one of three major credit reporting agencies. And if you think for a minute the other two aren't paying attention to what goes on in this room, you're crazy.").) The result was a grossly inflated punitive damages award.

*Second*, the jury impermissibly punished Experian for alleged harm to non-parties arising from its suspicious mail policy, even though there was no showing that application of the policy in those other cases violated the FCRA. As noted above, Plaintiff presented no evidence indicating that Experian's decision to deem his letter suspicious was anything more than a single, isolated mistake by a low-level mailroom employee. Yet Plaintiff's counsel managed to transform this from a case about a simple mailroom failure into a case about alleged wrongful action on thousands of letters per day. (Trial Tr. at 280:3; *id.* at 287:19-21; *id.* at 289:13-15.) As a result, the jury impermissibly used the punitive damages award to punish Experian for harms allegedly visited on non-parties. *See Philip Morris*, 549 U.S. at 355.

Moreover, much of this alleged harm to non-parties occurred under circumstances in which Experian's suspicious mail policy was legal as applied. The Supreme Court has explained that a defendant cannot be punished "for conduct that was lawful where it occurred." *BMW*, 517 U.S. at 573; *see State Farm*, 538 U.S. at 421 (same). Here, however, the jury did just that by punishing Experian for its

31

suspicious mail policy as a whole.  At least two other district courts have held that Experian's policy does not violate the FCRA.  *See Turner*, 2017 WL 2832738, at *5; *In re Experian Info. Sols., Inc.*, 2017 WL 3559007, at *8.  In its order denying Experian's motion to reconsider, this Court distinguished these cases on the basis that the letters in question were sent by credit repair organizations.  (*See* Doc. 73 at 5.)  But the jury here was still allowed to punish Experian for alleged harm caused by its treatment of letters from credit repair organizations, even where that treatment arose in a jurisdiction where Experian's conduct has been explicitly declared legal.

*Third*, Experian was impermissibly punished for the nationality of its employees.  Comments tending "to arouse the regional prejudice of the jury" "improperly distract[ ] the jury from its sworn duty to hand down a verdict based on the evidence presented to it."  *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 539 (citation omitted).  Experian's motion in limine aimed at excluding appeals to this type of prejudice (Doc. 100) was granted.  (*See* Doc. 111 at 4 ("Plaintiff and any of his witnesses or counsel may not provide evidence or otherwise comment . . . that Experian is large and from out of town.  None of this evidence is relevant to the claims at issue and would be unduly prejudicial.").)  Nevertheless, Plaintiff's counsel made several inappropriate appeals to regional bias, criticizing Experian's decision to hire overseas employees.  (*See, e.g.*, Trial Tr. at 95:25-96:9 ("[W]hen Mr. Younger sent his dispute in and it was deemed to be suspicious, it was sent down

32

to a woman named Paz Salinas in Santiago, Chile.  This Chilean woman spent a minute and 15 seconds and mashed the button and sent him a letter saying, We don't believe it's you.  That's how they choose to do their business, and that's something you consider when you talk about punitive damages . . . ."); *id.* at 283:11-13.)  These improper arguments, coupled with the outrageous ratio of punitive to actual damages, indicates that the jury's verdict was likely "swayed by passion and prejudice." *Christopher*, 449 F.3d at 1368 (citation and internal quotation marks omitted).

*Fourth*, Experian was improperly punished for its size and profitability.  The fact that Experian "is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands" imposed on the conduct of its business. *BMW*, 517 U.S. at 585.  Indeed, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427.  Here, Plaintiff's counsel repeatedly suggested that Experian's size and profitability justify a large punitive damages award (*see* Trial Tr. at 96:10-16; 291:8-293:23), even though Experian's assets have "little to do with the actual harm sustained" by Plaintiff, *State Farm*, 538 U.S. at 427.  And there is strong reason to believe that the jury improperly punished Experian on this basis.  After asking the jury "What amount of money gets their attention?," Plaintiff's counsel told the jury that "one week of [Experian's] net profit after tax and everything is" just over $3 million.  (Trial Tr. at 291:24-25, 292:21-24.)  It is reasonable to conclude that this

33

formed the basis for the jury's $3 million punitive damages award. Punishing Experian based on its corporate profits—rather than its conduct and the "actual harm sustained" by the Plaintiff, *State Farm*, 538 U.S. at 427—violates the Due Process Clause.

*   *   *   *   *

As a result of Plaintiff's counsel's irrelevant, misleading, and improper arguments, the jury punished Experian for at least four impermissible reasons. The jury's verdict should thus be stricken in its entirety. At the very least, the jury's $3 million punitive damages award should be substantially reduced to no more than $45,000—consistent with the single-digit, 9:1 ratio implicitly authorized by the Supreme Court in *State Farm* for cases lacking extreme reprehensibility.

## CONCLUSION

For the reasons set forth above, this Court should grant Experian's post-trial motions, direct the entry of judgment in Experian's favor on all claims, or alternatively, grant a new trial on all claims.

Dated:  June 20, 2018                    Respectfully submitted,


                                         */s/ L. Jackson Young, Jr.*
                                         Gregory R. Hanthorn
                                         ASB 4664 N76G
                                         Rebecca Crawford Reynolds
                                         *Pro Hac Vice*
                                         JONES DAY
                                         1420 Peachtree Street, N.E., Ste. 800
                                         Atlanta, GA  30309-3053
                                         Telephone: (404) 581-3939
                                         Facsimile:  (404) 581-8330
                                         ghanthorn@jonesday.com
                                         rreynolds@jonesday.com

                                         L. Jackson Young, Jr.
                                         Ferguson Frost Moore & Young, LLP
                                         1400 Urban Center Drive, Suite 200
                                         Birmingham, AL  35242
                                         Telephone:  (205) 879-8722
                                         Facsimile:  (205) 879-8831
                                         ljy@ffmylaw.com

                                         *Counsel for Defendant*
                                         *Experian Information Solutions, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2018, I served the foregoing document on the

counsel of record listed below via filing on CM/ECF:

W. Whitney Seals
Cochrun & Seals LLC
P.O. Box 10448
Birmingham, AL  35202-0448
Telephone:  (205) 323-3900
Facsimile:  (205) 323-3906
filings@plc-law.com

John C. Hubbard
John C. Hubbard LLC
2015 First Avenue North
Birmingham, AL  35203
Telephone:  (205) 378-8121
Facsimile:  (205) 690-4525
jch@jchubbardlaw.com

*Attorneys for Plaintiff*
*Shaun Younger*

                                        */s/ L. Jackson Young, Jr.*
                                        L. Jackson Young, Jr.

                                        *Counsel for Defendant*
                                        *Experian Information Solutions, Inc.*