## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SHAUN YOUNGER, | |
| Plaintiff, | CASE NO.: 2:15-cv-00952-SGC |
| v. | OPPOSED |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ORAL ARGUMENT REQUESTED |
| Defendant. | |

## DEFENDANT EXPERIAN'S REPLY IN SUPPORT OF ITS COMBINED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION TO ALTER OR AMEND THE JUDGMENT, AND MOTION FOR NEW TRIAL

Experian Information Solutions, Inc. ("Experian") submits this reply in further support of its combined renewed motion for judgment as a matter of law, motion to alter or amend the judgment, and motion for a new trial.  (*See* Doc. 133).

**1.     PLAINTIFF'S COUNSEL'S INFLAMMATORY AND MISLEADING REFERENCES TO AN UNRELATED SETTLEMENT WARRANT A NEW TRIAL.**

In its Opening Brief, Experian demonstrated that Plaintiff's counsel's repeated mischaracterization and misuse of an untendered, irrelevant document (the Assurance of Voluntary Compliance or "AVC")—which was covered by a granted

motion *in limine*—merit a new trial.  (Doc. 133 at 5-13.)  Nothing in Plaintiff's opposition brief suggests otherwise.

First, Plaintiff's brief—just like his counsel's statements at trial—blatantly misrepresents the contents of the AVC, which did not find, let alone prove, that Experian did anything improper.  The AVC says that various states had "initiated a multistate investigation into certain segments of the credit reporting industry to examine concerns and disputes presented by consumers," including concerns by unidentified consumers regarding "the sale of direct-to-consumer products to consumers during credit report dispute phone calls[.]"  (*See* Doc. 133-1 at 3.[1]) Contrary to Plaintiff's counsel's highly prejudicial mischaracterization at trial,[2] there is no "agreement" or "finding" in the AVC that Experian participated in the direct-to-consumer marketing referenced by Plaintiff's counsel, or even an allegation that this consumer "concern" had been raised regarding Experian, as opposed to other credit reporting agencies ("CRAs").  (*See* Doc. 133-1.)  In fact, the AVC explicitly

---

[1] Page references for the AVC, Doc. 133-1, are to the AVC's original pagination.

[2] In his first question, before allowing anyone to see the AVC not listed on his Exhibit List, Plaintiff's counsel began: "a month after y'all sent the letter to Mr. Younger, Experian entered into an assurance of compliance with 31 states including the State of Alabama in which you agreed or it was found that you engaged in improper disclosure or marketing practices relating to the sale of direct-to-consumer products to consumer during credit report dispute phone calls?  Are you aware of that?"  (Trial Tr. at 257:18-25.)  Experian made no such admission and the AVC contained no finding that Experian had engaged in such conduct.  (*See* Doc. 133 at 8-9.)  And of course, "[a]ttorney questions are not evidence."  *United States v. Thomas*, 271 F. App'x 818, 824 (11th Cir. 2007) (citing *United States v. Works*, 526 F.2d 940, 945 n.19 (5th Cir. 1976)).

provides, "[t]he CRAs expressly deny any violation of and liability arising from any state, federal, or local law, and further expressly deny that any current or prior practice of any CRA . . . is or was deficient in any respect." (Doc. 133-1 at 34-35.)

Plaintiff's counsel further distorted the AVC when asking Mary Methvin whether she was surprised that Experian and other CRAs had entered into a settlement in which they agreed to delineate between dispute and marketing calls and come up with a script. (Trial Tr. at 260:3-9, 11.) Ms. Methvin testified that she was not surprised. (Trial Tr. at 260:10, 12.) This was not "impeachment" since there was nothing to impeach—except perhaps counsel's own misstatements. (*See* Trial Tr. 257:18-25.) At any rate, the AVC—which is neither a statement of facts nor an admission—is not proper impeachment material. *Cf. Martin v. Texas Emp. Ins. Ass'n*, 193 F.2d 645, 646 (5th Cir. 1952) ("[E]ven on cross-examination, an irrelevant question with an opprobrious innuendo should not be asked [of] a witness.").

Plaintiff's brief sidesteps his counsel's misrepresentation of the AVC, ignoring counsel's own questioning and his statements in closing argument, and instead claiming that he "read directly from the AVC itself." (*See* Doc. 139 at 8-9.) And Plaintiff's brief continues to misrepresent the AVC, asserting: "The AVC states in part that the States investigated concerns and disputes from consumers *and that the credit reporting agencies ("CRAs"), including Defendant Experian, 'engage in*

*improper disclosure or marketing practices relating to the sale of direct-to-consumer products to consumers during credit report dispute phone calls.*'" (Doc. 139 at 8 (emphasis added).)  Yet the AVC did not find that Experian had engaged in this conduct, nor did Experian agree that it has engaged in such conduct. Purportedly "read[ing] directly from the AVC" in no way excuses counsel's false and damaging claim that Experian had been found—or agreed—to have participated in such conduct.  (Doc. 139 at 8; Trial Tr. at 257:17-24.)

Moreover, Plaintiff cannot rely on the AVC because—as Plaintiff concedes—it was never even tendered into evidence.  That is because, as Plaintiff admits, "the references to the AVC were not made to prove Plaintiff's claims."  (Doc. 139 at 12.) Because the AVC is not in evidence, Plaintiff is bound by the only *actual* evidence in the record—the testimony of Ms. Methvin that Experian did *not* market to consumers during dispute phone calls.  (Trial Tr. at 257:8-11.)[3]  The authority cited by Plaintiff, *see Stepanovich v. City of Naples*, No. 17-12332, 2018 WL 1281782 (11th Cir. Mar. 13, 2018), is inapposite, as (unlike the deposition testimony in *Stepanovich*) the AVC was never introduced into evidence.  *Id.* at *7 ("portions" of

---

[3] *See also* Trial Tr. at 259:7-17; 260:13-16; *Blake v. Batmasian*, No. 15-81222-CIV, 2017 WL 657767, at *2 (S.D. Fla. Feb. 15, 2017) ("When applying Rule 608(b), it is essential to remember that the questioner is bound to accept the witness' answers as to the alleged conduct bearing on untruthfulness[; h]ence, the party challenging the veracity of the witness cannot later introduce extrinsic evidence to disprove any statement the witness makes in this respect." (citations omitted)); *see also United States v. Matthews*, 168 F.3d 1234, 1244 (11th Cir. 1999), *opinion amended on denial of reh'g sub nom. United States v. Moore*, 181 F.3d 1205 (11th Cir. 1999).

witness's prior deposition testimony were in fact "introduced" by both parties for impeachment purposes).  Moreover, even if the AVC had been introduced for impeachment purposes—which it was not—nothing in *Stepanovich* permits a party to argue to the jury (as Plaintiff did here) that it should be considered as *substantive* evidence.  Because all of the record evidence indicates that Experian did not try to sell products on dispute calls, Experian is entitled to a new trial.[4]

Notwithstanding the lack of evidence, Plaintiff's counsel repeatedly argued at closing that Experian did try to sell to consumers disputing items generally and to consumers calling the number provided in suspicious mail letters.[5]  Plaintiff's counsel also fictively "created" evidence from whole cloth in closing by urging that there was a financial determination by a "bean-counter" at Experian that it could

---

[4] *See McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990) (cited at Doc. 133 at 12) (affirming grant of new trial because counsel's closing argument focused on evidence never admitted and "improper argument may be the basis for a new trial even if no objection has been raised"); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 285 (5th Cir. 1975) (cited at Doc. 133 at 11-12) (reversing and remanding for a new trial, even absent an objection at trial, where counsel asserted in closing that a witness made an admission that the testimony in record did not support).

[5] Trial Tr. at 286:3-4 ("And then they're making money on the back end selling things to concerned customers that call in."); *id.* at 286:11-14 ("Nothing in the law says, Hey, you get this option, and then if they call in, you can sell them stuff.  That's not how it's supposed to work, and yet that's the sham policy they've come up with.").  In his rebuttal closing, Plaintiff's counsel even went so far as to argue that "*We have, what I talked about, a consent order entered into with 31 states' attorneys general*, and you have Ms. Methvin's word for it. So you've got to decide which one you believe."  Trial Tr. at 313:4-7 (emphasis added).  Plaintiff pitted the actual evidence— Ms. Methvin's word—against his mischaracterization of the AVC that was never even offered into evidence.  This alone mandates retrial.  *McWhorter*, 906 F.2d at 677; *Edwards*, 512 F.2d at 285.

make more money by not reinvestigating disputes and by marketing products on dispute calls.[6]  No evidence was even tendered that it was more profitable to examine letters and make "suspicious mail" determinations, followed by a letter, than to reinvestigate disputes from actual consumers.  Indeed, Plaintiff did not even pretend to identify how many letters Experian believed were suspicious that turned out to be from consumers; he simply urged in closing that all of them should be assumed to be directly from consumers.[7]

Tellingly, Plaintiff does not deny that at closing argument he already knew that the AVC was not tendered into evidence, that it was objected to in examination,

---

[6] *See* Trial Tr. at 285:6 – 286:4 ("Why is it important that he call you?  Well, you heard me talk to Ms. Methvin about that.  Experian, amongst others, had gotten into trouble because they were trying to sell credit reporting stuff, other products to people that would call in with these disputes. [objection, overruled]  As I was saying, it's important to call in because they're going to sell you stuff. . . .  And what better customer for credit monitoring would you have than someone that has gotten a letter saying, Hey, we've gotten a suspicious request.  Better call us.  And as soon as we call, Got something we can sell you to protect you.  So think about it.  Experian is saving money on the front end by not investigating up to 2,000 disputes a day.  And then they're making money on the back end selling things to concerned consumers that call in."); *id.* at 286:25-287:2 ("And then the bonus is if 10 percent of those 2,000 call in, we got a chance to sell them something."); *id.* at 287:4-7 ("Some bean-counter somewhere looked at, What does it cost us to investigate?  What aren't we selling enough of these products?").

[7] Trial Tr. at 311:24 – 312:2 ("The same thing that has happened apparently for years to thousands and thousands and thousands of people.  These disputes just don't get investigated and that's too bad."); *see generally* Trial Tr. at 285:19 – 286:10.  As multiple courts have noted, Experian's suspicious mail policy *does* appropriately capture and turn away mail that is not sent directly by the consumer.  *See*, *e.g.*, *Turner v. Experian Info. Sols., Inc*., No. 3:16-cv-630, 2017 WL 2832738 (N.D. Ohio June 30, 2017), *aff'd mem.*, No. 17-3795 (6th Cir. Mar. 1, 2018); *In re Experian Info. Sols., Inc*., No. CV-15-01212, 2017 WL 3559007 (Lead Case) (D. Az. Aug. 17, 2017).

and that it was covered by Experian's Unopposed Motion In Limine No. 4.[8]  The

AVC was not tendered into evidence for good reason: It was irrelevant and

prejudicial, and Federal Rule of Evidence 408 expressly prohibits the admission of

evidence of settlements, even for impeachment purposes.  (Doc. 133 at 9.)

Plaintiff claims that Rule 408 does not apply because the AVC did not arise

out of the same transaction that is in dispute and, even if it did, that evidence of

settlement agreements is admissible for "other purposes."  (Doc. 139 at 9-12).  But

Plaintiff cites only *Dallis v. Aetna Life Ins. Co.*, which expressly did "not reach the

question of whether Rule 408 bars evidence of a settlement between one of the

parties and a third party when such settlement involves similar circumstances to, but

does not arise out of, the transaction with which the litigation is concerned."  768

F.2d 1303, 1307, n.2 (11th Cir. 1985).  And if Plaintiff is contending that the AVC

does not involve "similar circumstances" to "the transaction with which the litigation

is concerned," then his argument that the AVC is relevant must fail.  Furthermore,

the cases cited by Plaintiff for the proposition that settlements may be admitted for

---

[8] *See* Trial Tr. at 285:11-14 (noting sidebar in which Experian articulated its objections);
Doc. 133 at 7 (noting grounds for objection, which Plaintiff's counsel did not refute in his
opposition brief).  Even if Experian's counsel had not objected at trial, "[o]nce the court rules
definitively on the record—either before or at trial—a party need not renew an objection or offer
of proof to preserve a claim of error for appeal."  Fed. R. Evid. 103(b).

"other purposes" do not aid Plaintiff here, as those settlements were admitted for very narrow purposes on very narrow grounds.[9]

Further, Experian never "opened the door" to Plaintiff's use of the AVC. Plaintiff tries to cast his references to the AVC as being necessitated by evidence that "Mr. Younger did not call the toll free number listed on the letter Experian sent to him[.]"  (Doc. 139 at 6, n.2.)  Yet that evidence is not controverted by the AVC.

Plaintiff next claims that he was trying to cure the introduction of testimony allegedly precluded by one of his motions *in limine*.  (*See* Doc. 139 at 6-8.)  Putting aside the notion that one error could invite another, Experian did not violate an order *in limine*.  Plaintiff moved to exclude evidence of "Plaintiff's obligations after sending [the] dispute."  (Doc. 99 at 7-8.)  The Court granted Plaintiff's motion, stating: "Plaintiff did not have any obligation to call Experian or send Experian another letter."  (Doc. 111 at 4.)  The Court did expressly allow Experian to present evidence that it had asked Plaintiff to call:  "Of course, Experian may present evidence of its response to Plaintiff's letter, in which it asked Plaintiff to call, but

---

[9] *See Johnson v. Hugo's Skateaway*, 974 F.2d 1408, 1413 (4th Cir. 1992) (admitting prior consent decree only for the purpose of having the jury determine whether defendant had complied with the decree); *United States v. Gilbert*, 668 F.2d 94, 97 (2nd Cir. 1981) (prior consent decree admitted into evidence as Rule 404(b) evidence to show that defendant "knew of the SEC reporting requirements involved in the decree" and court "cautioned the jury as to limited inferences they could permissibly draw from it"); *Drew v. Equifax Info. Servs., LLC*, No. C-07-00726, 2010 WL 5022466, at *6 (N.D. Cal. Dec. 3, 2010) (holding objection based on Rule 408 deemed waived because it was not raised, *inter alia*, in its motion in limine).

Experian may not argue Plaintiff had a duty or obligation to call." (Doc. 111 at 4 n.2.) Evidence of this response is the very evidence Plaintiff claims violated the order.

Finally, Plaintiff's references to cases in which motions *in limine* were denied prior to trial and the parties were required to assert their objections at trial do not aid his position here. Experian's motion *in limine* No. 4 was granted, Experian objected at trial including on the grounds of that motion, and Experian addressed the issues of the AVC in its Opening Brief. The impropriety of the AVC is squarely before the Court. *See McWhorter*, 906 F.2d at 677 (affirming trial court's decision to grant a new trial because counsel's closing argument focused on evidence expressly excluded by the court, despite no objection at trial); *Edwards*, 512 F.2d at 285 (reversing and remanding for a new trial, even though the opposing party did not object at trial, where counsel asserted in closing that a witness made an admission that the testimony in record did not support); *see also* Doc. 133 at 10-13.

## 2. PLAINTIFF'S CLAIMED EMOTIONAL DISTRESS DAMAGES DO NOT MEET THE STANDARD FOR RECOVERABLE EMOTIONAL DISTRESS IN THE ELEVENTH CIRCUIT.

In its Opening Brief, Experian demonstrated that—under *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263 (11th Cir. 2014) and *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005)—Plaintiff's testimony that he was "a little upset, a little aggravated, [and] a little irritated" when he read Experian's dispute

letter (Trial Tr. at 182:7-13), does not meet the standard for recoverable emotional distress in the Eleventh Circuit.  (Doc. 133 at 13-14.)  Plaintiff's brief fails to address these two cases in any way.  (*See* Doc. 139 at 19-20.)  Because *Lodge* and *Akouri* control here, Plaintiff has not shown actual damages.

### 3.   PLAINTIFF'S REFERENCES TO EXPERIAN'S SUSPICIOUS MAIL POLICY AS "ILLEGAL" AND THAT EXPERIAN'S CONDUCT VIOLATED THE FCRA WERE PREJUDICIAL TO EXPERIAN.

Experian's Opening Brief demonstrated that the partial grant of summary judgment on the negligent noncompliance claim created confusion and prejudice to Experian, particularly due to Plaintiff's counsel's references to Experian's suspicious mail policy as illegal or as violating the law.  (Doc. 133 at 14-17.)  Plaintiff argues that he did not prejudice Experian because he only called the policy "illegal" during his opening statement and a limiting instruction was provided to the jury following his use of this term.  (*See* Doc. 139 at 22.)  Even though Plaintiff did not continue to use the word "illegal," he still misrepresented the Court's holding by continuing to state that Experian's conduct had already been deemed an FCRA violation.[10]  Despite asking for (*see* Trial Tr. at 196:9-21) and receiving (*see* Trial

---

[10] The Court noted at a conference among counsel that "referring to [the failure to reinvestigate] as illegal suggest[ed] some kind of criminal conduct."  (Trial Tr. at 196:22-23; *see also* Trial Tr. at 197:13-18 ("And I certainly think that in the context of your opening statement and the reference to illegal, it seemed argumentative to me as well. . . . In addition to also conjuring this idea of criminal conduct."))  However, the terms "violated the law" and "illegal" are synonyms. *See Black's Law Dictionary*, at 864 (10th ed. 2014) ("**illegal**, *adj.* (17c) Forbidden by law; unlawful")); *accord e.g.*, *id.,* (5th ed. 1981) ("**Illegal.** Against or not authorized by law.").

Tr. at 197:6-10) guidance from the Court about how to refer to the negligence claim, Plaintiff's counsel continued to misstate the Court's summary judgment holding, including in closing argument, by stating the Court had found a violation:

> And I'm going to stop right there because I think it's only been given lip service.  Please tell me you are aware before you came in here this federal judge sitting here decided that the failure to investigate Mr. Younger's dispute was a negligent violation of the law.  You do understand that, do you not?  Before you got in here, she's already said that violated the law.  That's not something to determine.  And that's what it says on the form.

(Trial. Tr. at 288:19 – 289:1.)   Such references were indeed prejudicial and exacerbated the confusion caused by the partial summary judgment ruling.

## 4.   EXPERIAN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S WILLFUL NONCOMPLIANCE CLAIM

### A.   There Is No Evidence That Experian's Identification Of Plaintiff's Letter As Suspicious Was Anything More Than An Isolated Error That Cannot Amount To A Willful Violation.

Plaintiff bore the burden of proving, by clear and convincing evidence, that Experian willfully violated the FCRA when it asked for further information from Plaintiff before reinvestigating his dispute.  As this Court instructed the jury, "clear and convincing evidence" means proof that "the claim [ ] is *highly probable* or *reasonably certain*."  (Trial Tr. at 78:5-7 (emphasis added); *see also, e.g.*, *Mansfield v. Secretary*, 679 F.3d 1301, 1309 (11th Cir. 2012).)  Plaintiff's opposition brief confirms that he has failed to meet that heightened burden.  As Plaintiff acknowledges, it is unclear exactly why his letter was deemed suspicious by an

individual employee in Experian's mailroom.  (*See, e.g.*, Doc. 139 at 24, 30; *see also id.* at 31 ("The point is that nobody knows – neither Plaintiff nor . . . Experian.").) Like the trial record, Plaintiff's brief lacks any evidence that Experian's decision to deem his letter suspicious was anything other than a careless mistake by a mailroom employee.  Given this lack of evidence, Plaintiff has failed to satisfy his burden of demonstrating that it is "highly probable" or "reasonably certain" that Experian willfully violated the FCRA.  (*See* Doc. 133 at 18-19.)

Plaintiff attempts to shift the burden, arguing that "[t]he very fact that Experian cannot even explain what rendered Plaintiff's dispute 'suspicious' itself establishes a willful FCRA violation."  (Doc. 139 at 31; *see also id.* at 24 ("More compelling is that Experian has no idea who made the determination in this case or what it was about Younger's letter that made it 'suspicious.'").)  But Plaintiff provides no support for this shifting of the burden to Experian.  As this Court correctly instructed the jury, "*Mr. Younger* . . . has the burden of proof and must persuade you by clear and convincing evidence . . . that Experian willfully failed to comply with the act[.]"  (Trial Tr. at 324:15-19 (emphasis added).)  Consistent with that instruction (and well-settled law), it was up to Plaintiff to prove that Experian's conduct was far worse than "merely careless."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).  Because the record lacks any evidence to that effect, no reasonable juror could conclude that Experian willfully violated the FCRA.

**B.**  **Experian's Suspicious Mail Policy Does Not Constitute A Willful Violation of the FCRA.**

Rather than presenting evidence specific to Mr. Younger, Plaintiff argues that Experian's entire suspicious mail policy constitutes a willful FCRA violation.  (*See* Doc. 139 at 23-26.)  That argument fails for three independent reasons.

*First*, Plaintiff has failed to demonstrate that Experian's suspicious mail policy is even implicated by this case.  As Plaintiff admits, there is no evidence in the record that the mailroom employee who sorted Plaintiff's letter was correctly applying the suspicious mail policy.  (*See, e.g.*, Doc. 139 at 31 ("[T]here is no guarantee that the 'decider' (in a mailroom in Allen, Texas) even used a criteria stated in the [suspicious mail policy]."); *id.* (stating that the mailroom employee used a "set of criteria, which may or may not be the criteria in the [suspicious mail policy]").)  Accordingly, there is no basis for using the suspicious mail policy to find that Experian acted willfully with respect to the Plaintiff.

*Second*, Plaintiff has provided no basis on which a reasonable jury could find it "highly probable" or "reasonably certain" that Experian's policy as a whole constitutes a willful violation.  Plaintiff concedes that it is acceptable for Experian "to have some kind of policy to ferret out suspicious mail or inquiries."  (Doc. 139 at 29-30.)  Yet he fails to identify any evidence that this particular policy willfully violates the FCRA.

Instead, Plaintiff's brief relies on a series of unsupported claims.  For example, Plaintiff asserts, without any record citation, that the suspicious mail policy is "based upon the arbitrary and capricious whims" of mailroom employees.  (*Id.* at 25.)  Likewise, Plaintiff repeatedly contends, without support, that the policy "captured thousands of legitimate disputes per day[.]"  (*Id.* at 26; *see id.* at 30.)  But there was no evidence at trial that the mislabeling of legitimate letters as suspicious was a widespread or repeated problem.  And while Plaintiff suggests that the number of Experian employees reviewing mail was insufficient, he offers no evidence to that effect, nor does he demonstrate that Experian knew (from experience or complaints) that its procedures were inadequate.  Plaintiff bore the burden of proving it "highly probable" or "reasonably certain" that Experian willfully violated the FCRA.  He cannot satisfy that burden by merely speculating that Experian may not have hired enough mailroom employees or that these employees may have ignored Experian's suspicious mail criteria.

Here, too, Plaintiff tries to shift the burden of proof to Experian, faulting Experian for allegedly failing to prove that the vast majority of letters it deems suspicious are in fact suspicious.  (*See* Doc. 139 at 25.)  And he suggests that Experian was required to prove that "thousands" of suspicious letters were "frivolous or irrelevant."  (*See id.* at 25-26.)  Plaintiff has it backwards.  If he wanted to rely on the treatment of other letters to prove that Experian's suspicious mail

policy was a willful FCRA violation, it was *his burden* to develop evidence regarding those letters.   He did not, and—accordingly—there is no basis for a reasonable jury to find it "highly probable" or "reasonably certain" that Experian willfully failed to comply with the act.

*Third*, Experian's suspicious mail policy cannot constitute a willful violation because it is not "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time."   *Safeco*, 551 U.S. at 69-70.   Under *Safeco*, where an interpretation of the statute permitting the defendant's conduct "could reasonably have found support in the courts," a willfulness finding is precluded.   *Id.* at 70 n.20. Here, not only "could" Experian's policy "reasonably have found support in the courts"—*it already has* found support in at least two district courts (one of which was affirmed on appeal), which held that the very same suspicious mail policy does not violate the FCRA.   *See Turner*, 2017 WL 2832738, at *5; *In re Experian*, 2017 WL 3559007, at *8.   Experian's policy is therefore not objectively unreasonable and cannot constitute a willful violation.   (*See* Doc. 133 at 20-21.)

Plaintiff's only response is that *Turner* and *In re Experian*, unlike this case, "deal with credit repair organizations."   (Doc. 139 at 26.)   As explained in the opening brief, however, Plaintiff's counsel completely undercut this distinction by arguing that Experian's entire policy of screening out suspicious mail, including mail from credit repair organizations ("CROs"), was a willful violation.   (*See* Doc. 133 at

18, 22.)  If Plaintiff's claim is that the entire policy of screening suspicious letters is a willful violation, that necessarily implicates whether the policy was proper as a means of identifying CRO letters.  Plaintiff's brief fails to address this argument.

Instead, Plaintiff doubles down on the claim that the entire policy, including the treatment of CRO letters, willfully violates the act.  Plaintiff repeatedly cites the "thousands" of letters Experian deems suspicious in support of his willfulness argument, but identifies no reason to question the suspicions that the vast majority of those letters do not come directly from consumers.  (*See* Doc. 139 at 23-26.)  And Plaintiff criticizes the suspicious mail criteria (*see id.* at 30), which are designed, in large part, to identify letters from CROs.  Plaintiff cannot have it both ways: he cannot rely on thousands of CRO letters and on Experian's criteria for identifying those letters to paint Experian's policy as a widespread willful violation while simultaneously claiming that cases blessing Experian's treatment of CRO letters are inapplicable.

Plaintiff also completely overlooks Experian's citations to *Lindsey v. Experian Info. Solutions, Inc.*, in which a judge in this very District *explicitly held* that Experian's suspicious mail policy is not objectively unreasonable.  No. 2:15-CV-02353, 2017 WL 412889, at *4-5 (N.D. Ala. Jan. 31, 2017).  Rather than create an intra-District conflict, this Court should likewise conclude that Experian's policy is not objectively unreasonable.

5.     **THE PUNITIVE DAMAGES AWARD IS CONSTITUTIONALLY EXCESSIVE**

    A.     **The Punitive Damages Award Violates Due Process.**

The jury's extraordinary $3 million punitive damages award, which is 600 times greater than its $5,000 compensatory damages award, is constitutionally excessive.  Experian did not engage in unusually "reprehensible" misconduct, and the 600:1 disparity is unreasonable, disproportionate, and completely out of step with awards approved in other FCRA cases involving far more egregious behavior. (*See* Doc. 133 at 23-29.)  Plaintiff's brief does not indicate otherwise.

*First*, Plaintiff fails to explain how simply asking a consumer to call a toll-free number rises to the level of "reprehensible" misconduct.  Plaintiff makes no argument (1) that any "harm caused was physical"; (2) that Experian's "conduct evinced an indifference to or a reckless disregard of the health or safety of others"; or (3) that he was harmed as "the result of intentional malice, trickery, or deceit[.]" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003); *see* Doc. 139 at 27-31.

With respect to the first two factors, Plaintiff concedes that there is a "lack of physical injury or risk to health and safety," but argues, citing *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142 (4th Cir. 2008), that these two factors are inapplicable in FCRA cases.  (*See* Doc. 139 at 28.)  However, *Saunders* never says that these factors are inapplicable—only that they did not "weigh[] strongly" against

the award in that particular case.  526 F.3d at 153.  Indeed, it relied on the absence of these factors as a reason to "review the punitive damages award amount with a particularly critical eye."  *Id.*  Moreover, even if *Saunders* had suggested that Congress's authorization of punitive damages for FCRA violations (which rarely cause physical harm or endanger health or safety) overrides the *constitutionally mandated* due process factors articulated in *State Farm*, *see* 538 U.S. at 419, this Court should reject that suggestion.  Congress cannot circumvent constitutional requirements by statute.  And in any event, the purported reasoning for disregarding these factors makes no sense:  Even if Congress's authorization of punitive damages for FCRA violations means a lack of physical harm should not *preclude* punitive damages, it hardly follows that the absence of physical harm is irrelevant to the reprehensibility of the conduct or the *amount* of such damages.

Plaintiff's claim that Experian acted reprehensibly relies on only two of the *State Farm* factors: (1) financial vulnerability; and (2) repeated actions.  But neither factor remotely supports his claim.  Notably, Plaintiff cites no evidence that Mr. Younger himself was particularly vulnerable.  (*See* Doc. 139 at 29.)  Instead, he contends that, because credit reporting agencies "maintain files on all of us," "*every* consumer is 'vulnerable' dealing with any of the big-three CRAs on a credit reporting issue[.]"  (Doc. 139 at 29. (emphasis added).)  Plaintiff offers no authority—literally, zero citations—in support of this novel argument (*see id.*),

which would make every consumer in the country, up to and including Bill Gates and Warren Buffet, "financially vulnerable."   The *State Farm* factor focuses on whether the victim is *more* vulnerable than most, *see, e.g.*, *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 976 (8th Cir. 2014) (award justified because "this case involves a particularly vulnerable victim"), and there is nothing to support such a conclusion in Plaintiff's case.

The second factor cited by Plaintiff, whether Experian's "conduct involved repeated actions," *State Farm*, 538 U.S. at 419, also weighs against reprehensibility. As discussed above, there is no evidence that Experian's treatment of Plaintiff was due to anything more than a one-time mistake by a mailroom employee.  Given this lack of evidence, Plaintiff admits that, "[a]s to Plaintiff himself, [Experian's] conduct wasn't a 'repeated action.'"  (Doc. 139 at 29.)

Rather than focus on the treatment of Mr. Younger, Plaintiff argues that the conduct here involved "repeated actions" because "Experian was acting under its [suspicious mail policy]."  (*Id.*)  But Plaintiff offers no evidence that the mailroom employee correctly applied the policy, or that Experian's applications of the policy in other cases were improper.  The two and a half pages of Plaintiff's brief regarding "repeated actions" consist of a series of bald assertions unsupported by any citation to the record or case law.  (*See id.* at 29-31.)  Plaintiff simply assumes, without evidence, that other legitimate disputes were inappropriately screened out.  Because

there is no evidence that the suspicious mail policy is implicated here or that Experian acted wrongfully with respect to other letters, there is no basis for concluding that any misconduct on Experian's part was anything more than "an isolated incident" that cannot be fairly characterized as reprehensible. *State Farm*, 538 U.S. at 419.

*Second*, Plaintiff fails to demonstrate how an unprecedented 600:1 disparity between the compensatory and punitive damages is reasonable or constitutionally permissible. Plaintiff's primary argument is that *State Farm* does not create a "bright-line outer limit to the ratio." (Doc. 139 at 32.) Experian recognized that, however. (*See* Doc. 133 at 26.) Experian's *actual* argument—which Plaintiff does not address in any way—is that, in *State Farm*, the Supreme Court made absolutely clear that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. The Court further clarified that the very "few awards" that can acceptably exceed a single-digit ratio will generally involve "'a particularly egregious act[.]'" *Id.* (citation omitted). Because Experian's conduct was not particularly egregious here, this is not one of the "'few'" cases the Supreme Court had in mind when it suggested that exceeding a 9:1 ratio may be constitutionally permitted. Accordingly, the absolute maximum punitive damages award here should be $45,000. (*See* Doc. 133 at 26-27.)

Plaintiff is also unable to dispute Experian's argument that the jury's $3 million award and its 600:1 ratio of punitive damages to compensatory damages are completely out of step with awards approved in other FCRA cases, which typically involve single-digit ratios. (*See* Doc. 133 at 27-29.) In the very best case Plaintiff could find in support of his argument—*Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017)—the Fourth Circuit sided *against* the plaintiff, holding that the $2.5 million punitive damages award (a 408:1 ratio) was grossly excessive and must be reduced to no more than $600,000 (a 98:1 ratio). *Id.* at 261-62. Neither *Daugherty* nor any of the other FCRA cases cited in Plaintiff's brief approved a *triple-digit* ratio or a *seven-digit* award like the verdict imposed here. And—as explained in the opening brief—the cases (like *Daugherty*) in which double-digit ratios have been approved involved conduct far worse than Experian's. (*See* Doc. 133 at 28-29.)

Plaintiff argues that *Daugherty* involved less egregious misconduct, but this argument does not stand up to scrutiny. The defendant in *Daugherty* "repeatedly failed to correct Daugherty's erroneous account information over a 17-month period, despite receiving multiple letters from Daugherty, governmental inquiries, and multiple dispute verification requests[.]" 701 F. App'x at 259-60. As a result, Daugherty "faced potential foreclosure of his home[.]" *Id.* at 259. Plaintiff, by contrast, was merely asked to make a telephone call to verify his identity.

According to Plaintiff, the behavior in *Daugherty* was less reprehensible than Experian's because the defendant in that case "had no financial incentive to engage in its challenged conduct[.]"  (Doc. 139 at 34.)  But the defendant in *Daugherty* was held liable for willfully failing "to perform a reasonable investigation regarding the true status of Daugherty's account[.]"  701 F. App'x at 248.  Such an investigation—like the processing of a credit reporting dispute—would have cost the defendant money, so it clearly had a financial incentive not to perform the investigation.  In any event, Plaintiff has presented no evidence that Experian had a financial incentive to ask him—or any other consumer—for further information before reinvestigating a dispute.  If anything, Experian's efforts to protect against fraud are a substantial expense to the company.  Contrary to Plaintiff's claims, the AVC provides no indication that Experian has *ever* used its dispute hotline to sell products.  There is thus no evidentiary basis to conclude that Experian had a profit motive for asking Plaintiff to make a call.

Plaintiff further claims that "Experian's conduct in this case warrants an even higher ratio than in *Daugherty*" because "a consumer facing a *Daugherty*-like situation can always instruct the CRAs to note that a furnisher's entry on the consumer report is disputed by the consumer, so the consumer has some recourse." (Doc. 139 at 35.)  But Plaintiff had recourse to avoid harm here, too: he simply had to call Experian and instruct it that he was indeed making a dispute—and, unlike in

*Daugherty*, by doing so he could have actually gotten the subject of his dispute corrected.   Because *Daugherty* involved conduct far worse than Experian's (including a 17-month refusal to correct erroneous account information that almost cost Daugherty his home), upholding the jury's punitive damages award here—or reducing it to anything greater than $45,000 (a 9:1 ratio)—would be inconsistent with previous FCRA cases.  (*See* Doc. 133 at 27-29.)

Plaintiff's next claim is that the appropriate baseline for *State Farm*'s single-digit ratio limit is not the compensatory damages award, but instead the "*potential harm that a consumer in Plaintiff's position could suffer.*"  (Doc. 139 at 36 (emphasis added).)  This argument ignores *State Farm*'s plain text.  While noting that *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) instructed courts to consider "the disparity between the actual *or potential* harm suffered by the plaintiff and the punitive damages award,"  538 U.S. at 418 (emphasis added), *State Farm* made clear that "few awards exceeding a single-digit ratio between punitive and *compensatory damages* . . . will satisfy due process."   538 U.S. at 425 (emphasis added).  Accordingly, for purposes of the single-digit ratio limit, the relevant baseline is "compensatory damages," not "potential harm."

Moreover, even assuming that potential harm were relevant, *BMW* makes clear that the court must look to the "potential harm *suffered by* [*the plaintiff*]," 517 U.S. at 575 (emphasis added), not—as Plaintiff claims—the potential harm that

some imaginary consumer could suffer under circumstances made up by counsel, *see* Doc. 139 at 36-37 (describing an imaginary consumer who suffers $300,000 in actual damages).  Under Plaintiff's theory, there would be no functional limit on punitive damages (other than the limits of lawyers' imaginations in making up fictional stories like the one in Plaintiff's brief).  Here, the "potential harm *suffered by* [*the plaintiff*]," as opposed to some fictitious consumer, was incredibly trivial because he was only asked to dial a phone number.  If a potential harm can be averted by simply making a phone call, and a consumer refuses to make that call, chances are that the potential harm is not all that great.  The jury's $5,000 compensatory damages award is therefore the appropriate (if not grossly inflated) baseline.  Applying this baseline, the $3 million awarded by the jury is constitutionally excessive and must be reduced to no more than $45,000, consistent with the 9:1 limit set out in *State Farm* for cases lacking extreme reprehensibility.

### B.  <u>The Jury Was Improperly Swayed By Plaintiff's Counsel's Extraneous And Impermissible Arguments For Punishing Experian.</u>

Experian's opening brief explained—at length—that, as a result of Plaintiff's counsel's irrelevant, misleading, and improper arguments, the jury punished Experian for at least four impermissible reasons: (1) based on the groundless claim that it harmed non-parties by trying to sell them products on its dispute hotline; (2) for conduct related to its suspicious mail policy that allegedly harmed non-parties,

even though that conduct was legal if it occurred; (3) for the nationality of its employees; and (4) for its size and profitability.  (*See* Doc. 133 at 23, 29-34.) Plaintiff's brief ignores all of these arguments—presumably because Plaintiff has no response.  Plaintiff's failure to even attempt a response demonstrates that, in light of Plaintiff's counsel's extraneous and impermissible arguments for punishing Experian, the jury's verdict should be stricken in its entirety.  At the very least, the punitive damages award should be substantially reduced on this basis.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should grant Experian's post-trial motions, direct the entry of judgment in Experian's favor on all claims, or alternatively, grant a new trial on all claims.

Dated:  July 12, 2018                         Respectfully submitted,


                                              */s/ L. Jackson Young, Jr.*
                                              Gregory R. Hanthorn
                                              ASB 4664 N76G
                                              Rebecca Crawford Reynolds
                                              *Pro Hac Vice*
                                              JONES DAY
                                              1420 Peachtree Street, N.E., Ste. 800
                                              Atlanta, GA  30309-3053
                                              Telephone: (404) 581-3939
                                              Facsimile:  (404) 581-8330
                                              ghanthorn@jonesday.com
                                              rreynolds@jonesday.com

                                              L. Jackson Young, Jr.
                                              Ferguson Frost Moore & Young, LLP
                                              1400 Urban Center Drive, Suite 200
                                              Birmingham, AL  35242
                                              Telephone:  (205) 879-8722
                                              Facsimile:  (205) 879-8831
                                              LJY@ffmylaw.com

                                              *Counsel for Defendant*
                                              *Experian Information Solutions, Inc.*

{W0571044.1 }

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2018, I served the foregoing document on the

counsel of record listed below via filing on CM/ECF:

W. Whitney Seals
Cochrun & Seals LLC
P.O. Box 10448
Birmingham, AL  35202-0448
Telephone:  (205) 323-3900
Facsimile:  (205) 323-3906
filings@plc-law.com

John C. Hubbard
John C. Hubbard LLC
2015 First Avenue North
Birmingham, AL  35203
Telephone:  (205) 378-8121
Facsimile:  (205) 690-4525
jch@jchubbardlaw.com

*Attorneys for Plaintiff*
*Shaun Younger*

/s/ L. Jackson Young, Jr.
L. Jackson Young, Jr.

*Counsel for Defendant*
*Experian Information Solutions, Inc.*